GENERAL MOTORS CORPORATION, CHEVROLET MOTOR DIVISION (N.K.A.
HYDRA-MATIC DIVISION), APPELLANT, *v.* LIMBACH, TAX COMMR., APPELLEE.

[Cite as General Motors Corp., Chevrolet Motor Div. *v.* Limbach (1989),
47 Ohio St. 3d 72.]

(No. 88-720—Submitted September 19, 1989—Decided December 13, 1989.)

*Carlile, Patchen, Murphy &
Allison* and *Robert J. Kosydar,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, and *Richard C. Farrin,* for appellee.

*Per Curiam.* We will address each
of the contested purchases *seriatim.*

I
Designs and Drawings

GM contracted with several outside design firms to design machinery. The design firms customarily sent the designs on tracings to GM. GM usually sent the tracings to other firms which produced the machinery that GM used in the production process. The machinery had to conform to the design on the tracing.

In a notice of additional authority and at oral argument, the commissioner conceded that these transactions were exempt professional service transactions under *Emery Industries, Inc.* v. *Limbach* (1989), 43 Ohio St. 3d 134, 539 N.E. 2d 608, and *General Motors Corp.* v. *Limbach* (1989), 44 Ohio St. 3d 115, 541 N.E. 2d 593. Accordingly, we reverse the BTA's decision assessing these purchases.

II
Gauge Masters

GM tests every fifth to fiftieth manufactured part to ensure that it manufactures all parts to specifications. Gauges with which GM tests the parts require regular calibration. To calibrate the gauges GM places the contested gauge masters, which are, essentially, ideal parts, in the gauges and adjusts the gauges to the correct readings. GM's production employees calibrate the gauges at the beginning of each shift, after lunch break, and whenever they suspect that a gauge is out of calibration.

R.C. 5739.02 levies a sales tax on retail sales made in Ohio, and R.C. 5741.02 levies a use tax on the storage, use, or other consumption of tangible personal property in Ohio. Under R.C. 5739.01(E)(2), a "[r]etail sale * * * include[s] all sales except those in which the purpose of the consumer is * * * to use or consume the thing transferred directly in the production of tangible personal property * * * for sale by manufacturing, [or] processing."[1]

During the audit period, "manufacturing" or "processing" was defined in R.C. 5739.01(S) (now redefined in [R]) as:

"* * * [T]he transformation or conversion of material or things into a different state or form from that in which they originally existed and, for the purpose of the exceptions contained in division (E)(2) of this section, includes the adjuncts used during and in, and necessary to carry on and continue, production to complete a product at the same location after such transforming or converting has commenced."

In *Southwestern Portland Cement Co.* v. *Limbach* (1988), 35 Ohio St. 3d 196, 198, 519 N.E. 2d 831, 833-834, we reviewed the manufacturing exception and stated:

"* * * [T]o find a manfacturing exception under R.C. 5739.01(E)(2), it must first be determined that manufacturing has occurred (*i.e.,* a transformation or conversion of material or things into a different state or form has taken place). Then, the beginning and end of the manufacturing must be delineated. Finally, it must be decided whether the item under examination was used or consumed directly in manufacturing (*i.e.,* during and in the manufacturing period)."

In *Ohio Ferro-Alloys Corp.* v. *Kosydar* (1973), 34 Ohio St. 2d 113, 119, 63 O.O. 2d 195, 198-199, 296 N.E. 2d 533, 537, we stated that, to be found an exempt adjunct to manufacturing, the item must: (1) be auxiliary or subsidiary to the manufacturing process, (2) be used at the location where manufacturing is occurring, (3) be used after transforming or conversion has begun, and (4) be related to direct use or consumption in production.

In that case, we held a scales to be exempt. Ohio Ferro-Alloys weighed hot metal casts on the scales after it had removed the casts from the furnace and before it broke them into pieces sized according to customer specification. Ohio Ferro-Alloys used the scales during the manufacturing period, and the scales thus fulfilled the direct use requirement.

In the instant case, the gauges perform a similar function. The gauges enable GM to measure if it has built a production part correctly. GM uses the gauges on the products and during the manufacturing period, and the gauges, therefore, fulfill the direct use requirement.

Furthermore, the gauge masters, used to calibrate the gauges, are adjuncts to manufacturing. They aid in the operation of the gauges and, thus, are auxiliary or subsidiary to the manufacturing process. GM employs them at the gauge's location, which is also at the production machine's site. GM uses them after transforming has commenced and before transforming ends; thus, GM uses them during manufacturing. The gauge masters are related to direct use because GM uses them to calibrate the gauges which are used directly in manufacturing. Consequently, we hold that the gauge

---

[1] R.C. 5741.02(C)(2) renders the use tax inapplicable when the storage, use, or consumption would be an exempt retail sale if made in Ohio. Therefore, we need discuss only the sales tax.

masters are exempt from taxation and we reverse the BTA's decision regarding them.

## III

### Chip Conveying System

GM transforms grey iron, steel, and aluminum into transmissions. As these materials proceed through manufacturing, the machines transforming them produce metal chips as by-products. GM removes the chips from the production machinery with the conveying system equipment. GM conveys the chips, which are immersed in fluids, with augers, harpoon pushers, and other conveyors, to a shredder, which breaks the chips into smaller pieces, and a wringer, which removes fluids. GM then conveys the chips into rail cars for shipment and further processing by others. Only the conveying equipment is at issue.

At oral argument, GM conceded that the purchases of the disputed equipment are taxable under *Ford Motor Co.* v. *Limbach* (1987), 32 Ohio St. 3d 136, 512 N.E. 2d 658. See, also, *General Motors Corp.* v. *Limbach* (1988), 37 Ohio St. 3d 271, 525 N.E. 2d 779. Thus, we affirm the BTA's decision as to this equipment.

## IV

### Transmission Oil Purification System

GM tests all its transmissions before sending them to later assembly. It places preheated transmission oil into the transmissions and tests the transmissions. GM checks a transmission for torque, reverse, all forward gears, and shift points. If GM approves the transmission, the transmission continues along the production line. If GM does not approve it, GM sends it on a spur to the repair department. GM then repairs the transmission and tests it further.

The oil lubricates the transmission and provides the hydraulic fluid to enable the transmission to operate. At issue is the transmission oil purification system which provides the oil.

After testing, GM removes most of the oil from the transmission, but several quarts remain in the transmission of necessity. GM sells the unremoved oil with the transmission. GM conveys the removed oil to filtering devices and centrifuges where GM purifies the oil in a closed loop system. GM then retains the oil until it can be reused in the testing procedure.

We hold that the transmission oil is an adjunct to manufacturing. GM uses it in the testing operation as an aid to production. GM uses the oil during the manufacturing period and on the production line. The oil is related to direct use or consumption in production because GM uses it to test the transmissions. *Ohio Ferro-Alloys, supra.*

In *Timken Co.* v. *Kosydar* (1977), 52 Ohio St. 2d 131, 6 O.O. 3d 345, 369 N.E. 2d 1211, we held that systems which supplied and recirculated adjunct solutions and lubricants were adjuncts to manufacturing. We stated that the fluids and the recirculating systems comprised component systems that we would not separate into component parts, segregating the parts into those used directly in production and those not so used. Thus, if the fluid supplied by the system is an adjunct, the circulating system which supplied it is also an adjunct. Based upon *Timken,* the transmission oil here and the purification system that cleaned and supplied it are exempt as adjuncts.

## V

### Henry Filtration Systems

GM employs a coolant at various machines which cools and lubricates the machines and removes machined

chips. GM apparently applies the coolant to the machine and the machined part. The coolant flows from the machine and to, and then through, the filters, which remove the chips. The system then returns the coolant to the machine in a continuous process.

The BTA, in affirming the commissioner's order, relied on *White Motor Corp.* v. *Kosydar* (1977), 50 Ohio St. 2d 290, 4 O.O. 3d 451, 364 N.E. 2d 252. In *White Motor Corp.*, we found that a similar system for filtering and recirculating a cooling fluid was used at the same location as the manufacturing process and that it was used after transforming or conversion had commenced. However, we held that the system was not directly related to use or consumption in the production process. Instead, we held that only the apparatus on the production line, which sprayed the coolant on the interface between the tool and the machine part, was an adjunct, and that the coolant was used directly in manufacturing. The recirculating system, on the other hand, was not an adjunct. We adopted the BTA's analysis and held that the method of delivery of the coolant to the point of manufacture was not important once the coolant had arrived there.

Approximately six months later, in *Timken Co.* v. *Kosydar, supra,* we affirmed an assessment against a similar recirculating system, resolving to be consistent in reaching decisions concerning the manufacturing exception even though we may seem to be drawing artificial lines. *Id.* at 134-135, 6 O.O. 3d at 347, 369 N.E. 2d at 1213-1214. As noted above, however, the *Timken* court exempted from taxation other recirculating systems because it refused to separate the component parts of the systems into excepted and nonexcepted functions. Some of the systems operated directly on in-process material and some operated as adjuncts. The only recirculating system which the *Timken* court did not except was the system that supplied coolant for spraying onto the interface of the machine and the machined part, as in the instant case.

We see no distinction between the instant system, which would appear to be taxable under *White Motor* and *Timken,* and several of the other systems found exempt in *Timken.*. By attempting to be consistent with *White Motor,* the *Timken* decision itself was inconsistent. We will not allow that inconsistency to persist.

The instant system cooled the machine and, apparently, the machined part. It swept away metal chips. The coolant was applied directly to in-process products. Consequently, we hold that the instant system, which cools the machines and sprays coolant onto the machined part, is exempt. GM uses the coolant directly in manufacturing and, under *Timken,* we refuse to segregate the coolant and that part of the system which applies the coolant from the part that filters and recirculates it.

## VI

In summary, we hold that the portion of the BTA's decision which affirmed the assessment of the chip conveying system is reasonable and lawful, and we affirm it. Further, we hold that the portion of the BTA's decision which taxed designs and drawings, gauge masters, the transmission oil purification system, and the Henry filtration systems is unreasonable and unlawful, and we reverse it.

*Decision affirmed in part
and reversed in part.*

MOYER, C.J., SWEENEY, HOLMES, WRIGHT, H. BROWN and RESNICK, JJ., concur.

DOUGLAS, J., concurs separately.

DOUGLAS, J., concurring. I concur on the basis of *stare decisis*. In doing so, I, once again, call attention to the fact that to some, including me, it would appear that the only thing consistent about our decisions in these tax cases is our inconsistency.

With regard to some of these recurring thorny issues, the General Assembly presently has pending before it H.B. No. 531, regarding revision of sales tax exemptions applicable to manufacturers. I would respectfully urge the General Assembly to review this never-ending line of inconsistent cases and to pass legislation which definitively sets forth what, if anything, is exempt from taxation and then to reaffirm the general rule that unless a specific item is excepted from tax, it is taxable. Only then will we be able to bring about consistency and fairness to taxpayers and the Tax Commissioner — and surely at far less cost and consternation to all involved.