**John SHARP, Comptroller of Public Accounts, and Dan Morales, Attorney General of Texas, Appellants,**

v.

**TYLER PIPE INDUSTRIES, INC., Successor-in-Interest to Tyler Pipe Industries of Texas, Inc., Appellee.**

No. 03–95–00212–CV.

Court of Appeals of Texas, Austin.

March 13, 1996.

Rehearing Overruled April 24, 1996.

Dan Morales, Attorney General, Thomas J. Meaney, Assistant Attorney General, Taxation Division, Austin, for appellants.

David H. Gilliland, Clark, Thomas & Winters, Austin, for appellee.

Before CARROLL, C.J., and JONES and B.A. SMITH, JJ.

JONES, Justice.

Tyler Pipe Industries, Inc., successor-in-interest to Tyler Pipe Industries of Texas, Inc. ("Tyler Pipe"), sued State Comptroller John Sharp and State Attorney General Dan Morales (collectively the "Comptroller") seeking a refund of sales taxes paid in the purchase of certain equipment. *See* Tex. Tax Code Ann. § 112.151 (West 1992). The trial court granted summary judgment for Tyler Pipe, ordering the Comptroller to refund approximately $35,000. On appeal, the Comptroller asserts that the trial court misconstrued a statutory exemption for the purchase of property used in manufacturing. *See* Tax Code § 151.318(g). We will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

There are no disputed facts in this case. Tyler Pipe manufactures and sells cast-iron pipe and pipe fittings, using molds made of specially treated sand to produce the desired size and shape of both the interior and exterior surfaces of its products. There are five basic stages, followed by all manufacturers, in manufacturing cast-iron pipe and fittings: (1) melting scrap iron and steel; (2) forming a mold to the exact size and shape of the product being manufactured; (3) pouring the molten iron into the mold; (4) letting the molten iron cool and harden; and (5) remov-

ing the pipe casting from the mold and knocking off any rough edges.

Metal molds are used by some manufacturers in lieu of sand molds. Metal molds, which are permanent and can be used repeatedly, are used to make thin-walled, low-pressure pipe and fittings. Sand molds, on the other hand, are needed to make thick-walled, high-pressure pipe. Unlike metal molds, sand molds can be used only once, after which they are destroyed. It is through the use of one of these two types of molds that manufacturers of cast-iron pipe and fittings control the size and shape of the products they produce.

In 1990, Tyler Pipe bought certain equipment used for making sand molds to be employed in its manufacture of cast-iron pipe and fittings, paying sales taxes on the purchase. Tyler Pipe subsequently filed an administrative claim for a refund of $35,478.46, twenty-five percent of the total amount of tax paid, in accordance with the phase-in schedule for the "manufacturers' exemption." *See* Tax Code § 151.318(h). The tax division of the Comptroller's office denied the refund. The Comptroller subsequently affirmed the denial, concluding that although the molds themselves were used in the "actual manufacturing" of pipe and fittings, the mold-making equipment was not. Tyler Pipe appealed to the district court. After cross-motions for summary judgment were filed, the trial court granted summary judgment in favor of Tyler Pipe. It is from this judgment that the Comptroller appeals to this Court.

## DISCUSSION

In a single point of error, the Comptroller contends that Tyler Pipe's purchase of equipment for use in making sand molds does not qualify for the manufacturers' exemption from sales taxes found in section 151.318(g) of the Tax Code:

Each person engaged in manufacturing, processing, fabricating, or repairing tangible personal property for ultimate sale is entitled to a refund or a reduction in the amount of tax imposed by this chapter as provided by Subsection (h) for the purchase of machinery, equipment, and replacement parts or accessories with a use-

ful life in excess of six months if the equipment is *used or consumed in or during the actual manufacturing, processing, fabrication, or repair of tangible personal property for ultimate sale,* and the use or consumption of the property is necessary or essential to the manufacturing, processing, fabrication, or repair operation, or to a pollution control process.

Tax Code § 151.318(g) (emphasis added).

Of the statutory prerequisites for the manufacturers' exemption, there is no dispute that the mold-making equipment in question has a useful life in excess of six months. Nor is there any dispute that the mold-making equipment is necessary and essential to the production of cast-iron pipe and fittings. The sole issue here is whether such mold-making equipment is "used ... in or during the actual manufacturing" of Tyler Pipe's products. Because the mold-making equipment in question is used to form sand molds, which are not themselves for sale, but rather are used in turn to produce the desired size pipe and fittings, the Comptroller contends that the mold-making equipment is not used in the "actual manufacturing ... of tangible personal property for ultimate sale." In other words, the Comptroller argues that even when equipment is part of the fabrication process, it is not tax exempt unless it is used *directly on* the raw materials to produce the finished product.

### A. *"Manufacturing" vs. "Actual Manufacturing"*

The Comptroller argues first that by adopting Tyler Pipe's construction of section 151.318(g), the trial court gave no effect to the term "actual," thereby rendering it mere surplusage. The term "manufacturing" is defined in the Tax Code as "includ[ing] each operation beginning with the first stage in the production of tangible personal property and ending with the completion of tangible personal property having the physical properties ... that it has when transferred by the manufacturer to another." Tax Code § 151.318(d). The Comptroller argues, however, that the language of subsection (g) mandates a direct contact with the finished product in order to qualify for the exemption.

"Actual manufacturing," he contends, differs from "manufacturing," and the process of making a sand mold is distinct from that of making pipe and fittings. We conclude, however, that even assuming the legislature intended the term "actual" to limit the scope of "manufacturing," Tyler Pipe's mold-making equipment falls within any reasonable construction of "actual manufacturing."

"Actual" is defined simply as "existing in fact or reality: really acted ... or carried out ... [as] distinguished from apparent and nominal.... Something that ... exists in fact: reality." *Webster's Third New International Dictionary* 22 (Philip B. Gove ed., 1986). The summary-judgment evidence shows that the formation of a sand mold for the making of a pipe or fitting is not part of the mere *preparation* for the casting process, as the Comptroller contends. Rather, it is an indispensable operation in the actual production of cast-iron pipe and fittings. The summary-judgment evidence reflects that in this industry, because each mold is specialized for each pipe, and because sand molds can only be used once, manufacturers find it more efficient to produce their own sand molds than to purchase them from outside suppliers. As a result, the mold-making equipment and each mold it produces effectively act as a unit. The mold-making equipment is needed every time a mold is made; thus, because the mold can only be used once, the mold-making equipment is needed every time a pipe or fitting is made. Because each mold can be used to make only one product, the mold-making equipment has a direct relationship to the production process.

The way Tyler Pipe uses its mold-making equipment is analogous to the way a camera produces a photograph and the way a printing press produces a written publication. In photography, a camera is needed to produce a negative image—the intermediate product—which is then used to produce the positive print for sale. Similarly, printers need equipment to make printing plates, which are then used to transfer images to paper, making the final printed product. Because Tyler Pipe's mold-making equipment creates a unique mold that transfers specific measurements to molten iron to produce a pipe or fitting, we see no practical distinction between such equipment and a camera or plate-making equipment.

The Comptroller has admittedly allowed the sales tax exemption for both cameras and plate-making equipment. Moreover, other jurisdictions have also held such equipment to be exempt under similar statutes. For example, in allowing the tax exemption for a printer's plate-making equipment, the Massachusetts Supreme Judicial Court rejected the idea that printing plates were produced for the manufacturer's own use. *Courier Citizen Co. v. Commissioner of Corps. & Taxation,* 358 Mass. 563, 266 N.E.2d 284, 286 (1971). The printing plates in *Courier,* like the sand molds in the present case, were not reusable because they were discarded after the pressrun; therefore, their purpose was connected to a particular printing job, just as molds here are used in the fabrication of a particular pipe or fitting. *Id.* The court found that the production of printing plates was the first stage in the process culminating in the final printed product for sale. *Id.* Likewise, the production of sand molds via the mold-making equipment is simply an early stage in the production—the "actual manufacturing"—of cast-iron pipe and fittings.

## B. Presumption of Use in "Actual Manufacturing"?

The Comptroller next argues that because the mold-making equipment was admittedly essential to Tyler Pipe's overall manufacturing operation (the third requirement of section 151.318(g)), the trial court erroneously *presumed* that the equipment must have been used in the "actual manufacturing" of products for ultimate sale (the second statutory requirement). We find no indication in the record, however, that the trial court employed any such presumption or otherwise disregarded the requirement that the equipment in question be used in the actual manufacturing of property for ultimate sale. This second argument by the Comptroller seems to be simply a variation of his first argument.

## C. Split Among Jurisdictions

█ Finally, the Comptroller argues that the trial court refused to follow well-estab-

lished Texas law requiring strict construction of tax exemptions. *See, e.g., North Alamo Water Supply Corp. v. Willacy County Appraisal Dist.*, 804 S.W.2d 894, 899 (Tex.1991). In support of this argument, the Comptroller asserts that decisions from other jurisdictions have split into two groups: (1) those adopting the so-called "integrated plant theory," which gives similar exemptions a broader construction; and (2) those following the so-called "Ohio rule" or "physical change rule," which gives such exemptions a narrower reading. The Comptroller contends that by granting summary judgment for Tyler Pipe, the trial court committed error by failing to strictly construe section 151.318(g) of the Tax Code. We disagree.

The Comptroller is correct that a split exists among jurisdictions construing similar statutes. *See* John S. Herbrand, Annotation, *What Constitutes Direct Use Within Meaning of Statute Exempting from Sales and Use Taxes Equipment Directly Used in Production of Tangible Personal Property*, 3 A.L.R.4th 1129 (1981); W.E. Shipley, Annotation, *Items or Materials Exempt from Use Tax as Used in Manufacturing, Processing, or the Like*, 30 A.L.R.2d 1439 (1953). The Comptroller attempts to cast this division of authorities in terms of "liberal" and "strict," using these labels to argue that Texas law requires adoption of the construction embraced by the "strict" jurisdictions. But the labels are misleading. Courts of virtually *all* jurisdictions are required to construe tax exemptions strictly. *See* 3A Norman J. Singer, *Sutherland Statutory Construction* § 66.09 (5th ed. 1992) Thus, the split among the courts that have addressed this issue is not based on "strict versus liberal" construction.

■ Rather, at least two other principles are at work. First, the rule of strict construction cannot be used as an excuse to stray from reasonableness. "It is generally held that the statutes exempting property from taxation should be strictly construed in favor of taxation, *but should not be interpreted unreasonably.*" 3A Singer, *supra*

§ 66.09, at 43 (emphasis added). This principle comports with Texas law, where courts are obliged to presume that the legislature intended a "just and reasonable result." Tex.Gov't Code Ann. § 311.021(3) (West 1988).

■ Second, the cardinal rule of statutory construction is always to determine and give effect to the intention of the legislature. *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex.1994). Again, Texas courts are admonished to consider "the language of the statute, legislative history, the nature and object to be obtained, and the consequences that would follow from alternative constructions." *Id.*

■ The Texas manufacturers' exemption statute was originally enacted by the legislature in 1961 and has been amended several times over the years.[1] Although the legislative history of these enactments is unenlightening, there can be little doubt of the legislature's general purposes: (1) to encourage economic development in this state; (2) to avoid pyramiding the sales tax on successive buyers and sellers, which would result in the ultimate consumer paying sales tax on sales tax; and (3) to strike a balance between the policy of avoiding multiple taxation and the need to raise revenue for the state. *See, e.g., Niagara Mohawk Power Corp. v. Wanamaker*, 286 A.D. 446, 144 N.Y.S.2d 458, 461–62 (1955), *aff'd mem.*, 2 N.Y.2d 764, 157 N.Y.S.2d 972, 139 N.E.2d 150 (1956). Given such purposes, courts of other jurisdictions have recognized that construing tax-exemption statutes too narrowly could defeat the legislative purpose of such statutes:

> [T]he production exemption must be viewed in light of the legislative intent to tax the ultimate retail consumer, thus avoiding multiple taxation. The production exemption is designed to exempt those items and costs of producing the final product for resale to the consumer. Although construction of exemption statutes

---

1. *See* Limited Sales, Excise and Use Tax Act, 57th Leg., 1st C.S., ch. 24, art. I, § 1, 1961 Tex.Gen.Laws 71, 76, 82; Act of May 2, 1963, 58th Leg., R.S., ch. 138, § 1, 1963 Tex.Gen.Laws 371, 376, 382; Tax Code—Title 2, 67th Leg., R.S., ch. 389, § 1, 1981 Tex.Gen.Laws 1490, 1564; Act of July 21, 1987, 70th Leg., 2nd C.S., ch. 5, art. 1, pt. 4, § 26, 1987 Tex.Gen.Laws 9, 19; Act of May 8, 1989, 71st Leg., R.S., ch. 154, § 1, 1989 Tex.Gen.Laws 532, 533.

is generally to be construed against the taxpayer, the overall scheme and intent of the legislation must not be overlooked.

*Idaho State Tax Comm'n v. Haener Bros.,* 121 Idaho 741, 828 P.2d 304, 307 (1992). Likewise, in construing a similar statute, the Supreme Court of Georgia stated that the rule of strict construction "should not impinge on the other rule that a statute is to be construed in accordance with its real intent and meaning and not so strictly as to defeat the legislative purpose." *Amoena Corp. v. Strickland,* 248 Ga. 496, 283 S.E.2d 894, 897 (1981). We believe the construction urged by the Comptroller is unreasonably restrictive and would tend to thwart, not further, the legislature's intent.

In support of his argument that the exemption requires direct involvement or contact with the product being manufactured for ultimate sale, the Comptroller relies on three Ohio Supreme Court cases: *Canton Malleable Iron Co. v. Porterfield,* 30 Ohio St.2d 163, 283 N.E.2d 434 (1972); *Ohio Stove Co. v. Bowers,* 171 Ohio St. 484, 172 N.E.2d 295 (1961); *General Motors Corp. v. Bowers,* 169 Ohio St. 361, 159 N.E.2d 739 (1959). While these cases arguably support the Comptroller's position, we decline to adopt the Ohio rule, for the following reasons.

First, the Comptroller fails to note the differences in statutory language. The Ohio statute requires machinery to be used "directly" in manufacturing. *See, e.g., General Motors Corp. v. Limbach,* 47 Ohio St.3d 72, 73, 547 N.E.2d 1167, 1168 (1989). Indeed, the Ohio cases have consistently stressed the importance of the term "directly." For example, when refusing to allow the exemption for tools purchased to manufacture other tools that were then used to produce the property for ultimate sale, the Ohio court said that to allow the exemption "would constitute a disregard of the plain meaning of the word 'directly' which the dictionaries define as 'without the intervention of a medium or agent.' It would seem beyond cavil that the manufactured tools are an intervention between the purchased tools and the final

body panels." *General Motors Corp.,* 159 N.E.2d at 741.

The Ohio Supreme Court recently confirmed its total reliance on the term "directly" for its continued loyalty to the "physical change rule." In *Stoneco, Inc. v. Limbach,* 53 Ohio St.3d 170, 560 N.E.2d 578 (1990), the court construed a personal-property-tax statute allowing an investment credit based on ownership of "machinery ... used or designed to be used in refining or manufacturing." *Id.* at 579. Unlike the sales-tax-exemption statute, this provision did not contain the term "directly." In holding the property to be exempt, the court stated:

> The statutes under review do not contain the term "directly," as does the sales tax. *This term has prevented us from applying the integrated plant test to the sales tax,* to which we have instead applied the physical change test. However, we see no corresponding statutory constraint against applying an integrated plant test to personal property tax cases and to the disputed investment credit.

*Id.* at 581 (emphasis added) (citations omitted).

The Texas statute contains no restriction such as that determined by the Ohio court to be imposed by the term "directly." We do not construe the term "actual" to prohibit the existence of any intervening medium or agent in the manufacturing process. Moreover, as discussed above, Tyler Pipe's use of its mold-making equipment is in fact part of the manufacturing process; it does not play a nominal, incidental, or attenuated role in the production of pipe. The equipment's connection to the manufacturing process is not potential, speculative, or constructive; it is an integral part of the production of cast-iron pipe and fittings.

In addition, the overwhelming majority of jurisdictions that have addressed similar tax-exemption statutes, even those containing the term "directly," have rejected Ohio's physical-change theory in favor of a broader reading.[2] As one frustrated Ohio Supreme Court

---

**2.** *See generally Duval Sierrita Corp. v. Arizona Dep't of Revenue,* 116 Ariz. 200, 568 P.2d 1098,

1104 (Ct.App.1977) ("used directly") (stating that "we believe the corollary to the 'Ohio rule' and

justice stated in a plea for the court to abandon the physical-change rule, "The great weight of authority throughout the country supports adoption of the 'integrated plant' theory." *OAMCO v. Lindley,* 24 Ohio St.3d 124, 127 n. 1, 493 N.E.2d 1345, 1349 n. 1 (1986) (Wright, J., concurring).

Thus, most state courts have allowed an exemption in circumstances similar to those in the present case even though the statutes of those jurisdictions generally require that the property's use in manufacturing be "direct," a more specific and demanding requirement than "actual." For example, the Idaho Supreme Court, construing a statute exempting property that was "primarily and directly used" in manufacturing operations, expressly held that machinery and tools used to construct and make other manufacturing machinery, tools, and materials are exempt. *Haener Bros.,* 828 P.2d at 310. The Idaho court concluded that the "primarily and directly" requirement

> does not require that the materials, equipment and property used in the production process must directly touch or be actually contained in the final product. The language "primarily and directly" only means that the materials and personal property must play a primary and direct role in making the final product marketable.... Machinery ... used to fabricate ... other equipment ... for manufacturing and processing is only one vital segment of the

complete integrated plant system and operation.

*Id.* at 315.

For purposes of this appeal, it seems to us unnecessary that we formally adopt or approve the so-called integrated-plant theory, which, according to Tyler Pipe, "embraces all of the operations in a manufacturing plant that are causally connected to the production of the final product." Accordingly, we simply conclude that the equipment Tyler Pipe uses in making sand molds is, in these circumstances, "used ... in the actual manufacturing" of its cast-iron pipe and fittings. We overrule the Comptroller's point of error.

## CONCLUSION

Because Tyler Pipe conclusively demonstrated that its mold-making equipment is used in the "actual manufacturing" of cast-iron pipe and fittings, we conclude that it is entitled to a sales tax exemption in the purchase of that equipment. We affirm the judgment of the trial court.

its interpretation by that state is too narrow"); *Pledger v. Easco Hand Tools, Inc.,* 304 Ark. 47, 800 S.W.2d 690 (1990) ("used directly"); *Arkansas Ry. Equip. Co. v. Heath,* 257 Ark. 651, 519 S.W.2d 45 (1975); *Idaho State Tax Comm'n v. Haener Bros.,* 121 Idaho 741, 828 P.2d 304, 310 (1992) ("primarily and directly used") (criticizing as "twisted [and] unreasonable" an interpretation that only equipment that touches final product is entitled to exemption); *Indiana Dep't of State Revenue v. Cave Stone, Inc.,* 457 N.E.2d 520 (Ind.1983) ("directly used ... in the direct production"); *General Motors Corp. v. Indiana Dep't of State Revenue,* 578 N.E.2d 399 (Ind.Tax Ct.1991); *City of Ames v. State Tax Comm'n,* 246 Iowa 1016, 71 N.W.2d 15 (1955) ("directly used"); *Ross v. Greene & Webb Lumber Co.,* 567 S.W.2d 302 (Ky.1978) ("used directly"); *Schenley Distillers, Inc. v. Commonwealth ex rel. Luckett,* 467 S.W.2d 598 (Ky.Ct.App.1971); *Courier Citizen Co. v. Commissioner of Corps. & Taxation,* 358 Mass. 563, 266 N.E.2d 284, 290 (1971) ("used directly") (stating that "[w]e think the

Ohio cases are too restrictive"); *Floyd Charcoal Co. v. Director of Revenue,* 599 S.W.2d 173, 177 (Mo.1980) ("used directly") (stating that "[t]he Ohio rule has been considered too restrictive by other courts which have been presented with a similar problem"); *Niagara Mohawk Power Corp. v. Wanamaker,* 286 A.D. 446, 144 N.Y.S.2d 458, 461–62 (1955) ("use[d] ... directly and exclusively") (stating that "'directly and exclusively' should not be construed to require the division into theoretically distinct stages of what is in fact continuous and indivisible"), *aff'd mem.,* 2 N.Y.S.2d 764, 157 N.Y.S.2d 972, 139 N.E.2d 150 (1956); *Manitowoc Co. v. City of Sturgeon Bay,* 122 Wis.2d 406, 362 N.W.2d 432 (Ct.App.1984) ("used directly"); *State Bd. of Equalization v. Cheyenne Newspapers, Inc.,* 611 P.2d 805 (Wyo. 1980) ("directly enters into"). *But see Hawes v. Custom Canners, Inc.,* 121 Ga.App. 203, 173 S.E.2d 400 (1970); *Webster Brick Co. v. Department of Taxation,* 219 Va. 81, 245 S.E.2d 252 (1978).