NUMBER 13-06-330-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 
 

SABINE MINING COMPANY, Appellant,


v.
 


SUSAN COMBS, COMPTROLLER OF PUBLIC

ACCOUNTS OF THE STATE OF TEXAS, ET AL., Appellees.

 


On appeal from the 126th District Court of Travis County, Texas.


 




MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Benavides and Vela


Memorandum Opinion by Justice Benavides



 In this appeal, we must decide whether replacement parts for ''dragline" machines
used in coal surface mining are tax exempt under the state tax code's "property used in
manufacturing" exemption. Tex. Tax Code Ann. § 151.318 (Vernon 2006). We find that 
because draglines do not directly make or cause a chemical or physical change to
marketable coal, and because surface mining is not a stage in the actual manufacturing
of marketable coal, draglines cannot be considered property used in manufacturing as it
is defined by the statute. We conclude, therefore, that dragline replacement parts are not
entitled to exemption from sales tax, and we affirm the judgment of the district court.

I. Factual Background


 Sabine Mining Company ("Sabine"), a subsidiary of the North American Coal
Company, is a Nevada corporation that operates the South Hallsville lignite mine near
Longview, Texas. In order to access coal, Sabine removes overburden--the layer of dirt
and rock that sits atop underground coal deposits--by using draglines. A dragline is a two
million pound machine, similar to a crane in appearance, with a long mechanical arm
attached to a bucket with an approximately eighty-six cubic yard capacity. The operator
of a dragline maneuvers the bucket to scoop away and remove overburden. With a single
scoop, a dragline can lift and remove up to 120 tons of overburden. Once the coal bed is
exposed, the coal is mined by bulldozers and then cleaned, blended, and delivered to a
power plant. There the coal is crushed to be used as boiler fuel.

 The removal of the overburden affects the coal in a variety of ways. It reduces the
weight and pressure upon the coal, thus causing invisible micro-fracturing. It also exposes
the coal to oxygen, which causes interstitial water to escape, drying the coal and causing
still more fracturing. Finally, the top six to twelve and one-half percent of coal often
crumbles because it is scraped by the draglines. These changes do not only alter the
physical appearance of the coal, they also increase the energy content within the coal, as
measured in British Thermal Units (BTUs).

 Sabine asserts that the draglines directly cause the coal to change physically and
chemically, and it considers excavation to be a stage in the actual manufacturing of
marketable coal. Therefore, Sabine argued that the purchase of replacement parts for
draglines should be tax exempt under section 151.318 of the Texas Tax Code, which
provides an exemption for property used in the manufacturing of tangible products. See
Id. § 151.318. Sabine requested an $896,410 sales tax refund from the state.

 The Comptroller of Public Accounts, however, refused to refund the tax payments. 
Sabine responded by filing suit against the Comptroller (1) and Attorney General (collectively
"the Comptroller") on April 30, 2004. See Id. §§ 111.104; 112.151. In the subsequent
bench trial in Travis County District Court, the court found that (1) the physical and
chemical changes undergone by the coal in surface mining were only indirectly related to
the dragline, and (2) the excavation was not a step in the "actual manufacturing" of
marketable coal--it was merely preparation for manufacturing. Thus, the trial court
rendered judgment that Sabine take nothing by its tax refund suit. Sabine now appeals the
legal and factual sufficiency of the evidence supporting the district court's judgment.

II. Standard of Review 


 At the close of the bench trial, the district court entered findings of fact, which have
the "same force and dignity as a jury's verdict." Rapp Collins Worldwide, Inc. v. Mohr, 982
S.W.2d 478, 481 (Tex. App.--Dallas 1998, no pet.). However, while findings of fact have
the same force and dignity as a jury's verdict, they are not conclusive when a complete
reporter's record appears in the record, as in the instant case. Tucker v. Tucker, 908
S.W.2d 530, 532 (Tex. App.-San Antonio 1995, writ denied). We review the findings of
fact for legal and factual sufficiency of the evidence, which is the standard we apply when
reviewing the evidence supporting jury findings. Anderson v. City of Seven Points, 806
S.W.2d 791, 794 (Tex. 1991).

 A party that attacks the legal sufficiency of an adverse fact-finding on which it has
the burden of proof must demonstrate that the evidence establishes all facts in support of
the contrary claim as a matter of law. Dow Chemical Co. v. Francis, 46 S.W.3d 237, 241
(Tex. 2001). A party that attacks an adverse fact-finding on factual sufficiency grounds
must demonstrate it against the great weight and overwhelming preponderance of the
evidence. Id. at 242.

 A taxpayer who claims a tax exemption bears the burden of proving that the
exemption is applicable and that no exclusion applies. Tex. Tax Code Ann. §151.318®. 
Courts strictly construe the language of tax exemptions and place the burden upon those
who claim exemptions. Sundown Farms, Inc. v. State, 89 S.W.2d 291, 293 (Tex.
App.-Austin 2002, no pet.) (citing Bullock v. Nat'l Bankshares Corp., 584 S.W.2d 268, 274
(Tex. 1979)). Exemptions are "the antithesis of equality and uniformity and because they
place a greater burden on other tax paying businesses and individuals." Id.

III. Analysis


A. Strict Construction of Section 151.318

 The Texas Tax Code permits tax exemptions for enumerated property that is "sold,
leased, or rented to, or stored, used, or consumed by a manufacturer." Tex. Tax Code
Ann. §151.318(a). Section 151.318(a)(2) specifically permits a tax exemption for:

tangible personal property directly used or consumed in or during the actual
manufacturing, processing, or fabrication of tangible personal property for
ultimate sale if the use or consumption of the property is necessary or
essential to the manufacturing, processing, or fabrication operation and
directly makes or causes a chemical or physical change to . . . the product
being manufactured, processed, or fabricated for ultimate sale.


Id. § 151.318(a)(2) (emphasis added).

 The language which reads "directly make or cause chemical or physical change" is
an amendment to section 151.318 which was added by the legislature in 1997. Act of June
20, 1997, 75th Leg., R.S., ch. 1390, 1997 Tex. Sess. Law Serv. 5195 (amended 1997)
(current version at Tex. Tax Code Ann. § 151.318(a)(2) (Vernon 2006)). The Legislature
stated that the amendment was a direct response to two 1996 decisions from the Austin
Court of Appeals: Sharp v. Tyler Pipe Indus., Inc., 919 S.W.2d 157 (Tex. App.-Austin
1996, writ denied) and Sharp v. Chevron Chem. Co., 924 S.W.2d 429 (Tex. App.-Austin
1996, writ denied). Fiscal Note, Tex. H.B. 1855, 75th Leg., R.S. (1997) ("The bill would
effectively reverse two recent court decisions, Tyler Pipe v. Sharp and Chevron Chemical
v. Sharp, that resulted in an expansion of the sales tax exemption for manufacturing
equipment..."). Although the cases have lost precedential value since the legislature's
1997 amendments, they remain instructive because they are examples of how the
legislature does not want courts to interpret section 151.318.

 In Tyler Pipe, a pipe-manufacturing company sought a tax exemption under section
151.318 for the materials it used to make the molds which sized and shaped the pipes it
sold. Tyler Pipe, 919 S.W.2d at 158-59. The Comptroller argued that the mold-making
materials had a proximate, rather than a direct, relationship to the final tangible product
manufactured by the company--the pipes. Id. at 161-63. The court, however, rejected the
Comptroller's argument, and held that mold-making was a step in "actual manufacturing,"
and therefore, the company was entitled to the tax exemption. Id. at 162-63.

 In Chevron, the court applied essentially the same logic it used in the Tyler Pipe
decision. Chevron, 924 S.W.2d at 433. Chevron, a producer of plastics, had claimed that
pipes which were used to transport plastic-producing chemicals within a plastic factory
were tax-exempt because the transportation of the chemicals from one point to another
was a stage in the manufacturing of plastic. Id. Specifically, Chevron argued for--and the
court recognized--an "integrated" view of manufacturing in which "manufacturing" under
the tax code was construed broadly to include virtually all equipment connected with the
manufacturing process. Id.

 The legislature--presumably concerned with the revenue loss which might occur if
the "property used in manufacturing" tax exemption were interpreted to apply to virtually
all stages of the manufacturing process--rebuked the reasoning of both Tyler Pipe and
Chevron in 1997 by limiting tax-exempt property to that which "directly makes or causes
a chemical or physical change" to the raw material of the ultimate product. Act of June 20,
1997, 75th Leg., R.S., ch. 1390, 1997 Tex. Sess. Law Serv. 5195 (amended 1997); Fiscal
Note, Tex. H.B. 1855, 75th Leg., R.S. (1997). We, therefore, adhere to the apparent
legislative intent, and we construe the section 151.318 language in the instant case very
narrowly. (2)

 We now turn to the substance of Sabine's argument that there is insufficient
evidence to support the trial court's conclusion that dragline replacement parts are not tax
exempt under section 151.318. Sabine believes the exemption must apply because (1)
the surface mining operations in which draglines are used directly cause the marketable
coal to undergo physical and chemical changes, and (2) draglines are involved in the
actual manufacturing of marketable coal rather than mere preparation of the site. We
disagree with both arguments.

B. Direct Chemical or Physical Change to Marketable Coal


 Sabine argues that dragline replacement parts are tax exempt under section
151.318 because they directly cause physical change to marketable coal when removing
overburden. Specifically, Sabine argues that the release of pressure and the escape of
interstitial water that results from the removal of overburden causes micro-fracturing and
brittleness, which are physical changes. Sabine also argues that the fractures and
brittleness increase the energy within coal, which is a chemical change. While we agree
that these are significant physical and chemical changes, we disagree that these changes
are a "direct" result of the draglines.

 In large part, our reasoning is based upon our determination, explained above, that
the legislature desires courts to strictly construe the language of section 151.318 and to
ignore the reasoning in Tyler Pipe and Chevron, which were effectively overruled by the
1997 amendments. Act of June 20, 1997, 75th Leg., R.S., ch. 1390, 1997 Tex. Sess. Law
Serv. 5195 (amended 1997); Fiscal Note, Tex. H.B. 1855, 75th Leg., R.S. (1997). As such,
we must limit ourselves to applying a reasonable--not a broad or artful--definition of
"direct," and the reasonable definition of "direct" implies a close link with no intervening
causes. City of Amarillo v. Fenwick, 19 S.W.3d 499, 500 (Tex. App.--Amarillo 2000 pet.
ref'd) (defining directly as "connot[ing] an uninterrupted, close relationship or link between
the things being considered"); see also Black's Law Dictionary 460 (6th ed. 1990)
(defining directly as "without anything intervening");The American Heritage Dictionary
242 (3rd ed. 1994) (defining directly as "without anyone or anything intervening").

 Applying this analysis, we agree with the district court's assessment that air
intervenes to cause the changes to marketable coal, and that the dragline is merely an
indirect cause of the changes. Although the draglines remove overburden, it is the air
which causes the coal to dry and the water to escape. Sabine argues that such logic is
flawed because it absurdly implies, for instance, that a can of spray paint does not change
the physical appearance of a product because it is the paint--not the can--which has the
"direct" impact. That analogy, however, is inapposite. Sabine fails to appreciate that in the
spray paint example, the spray can generates the stream of paint which alters the physical
appearance of the product. In the case of marketable coal, however, draglines do not
generate the air which causes drying and micro-fracturing. The direct impact of the
draglines is the exposure of coal; the indirect impact of the draglines is that the coal they
expose is affected by air.

 Sabine also argues that the removal of overburden is tantamount to the shelling of
peanuts or the removal of tree bark, two activities for which the comptroller concedes
equipment is tax exempt under section 151.318 and section 3.300 of the administrative
code. Tex Tax Code Ann. § 151.318; 34 Tex. Admin. Code Ann. § 3.300 (2007). We feel,
however, that this analogy is likewise inapposite. The shelling of nuts and removal of bark
is the removal of something that has grown and developed as part of the nut or the tree,
whereas overburden is not part of lignite coal. Overburden did not--in a strictly natural,
botanical sense-- grow and develop with the coal. In the case of lignite coal, overburden
must be removed in order to reach the tangible product; in the case of nuts, the
nut--regardless of whether the shell is removed--is the tangible product. Similarly, the
wood--with or without bark--is the tangible product of a tree trunk. Overburden, on the
other hand, is not a part of lignite coal.

 Sabine's most persuasive argument is that the top three to six inches of coal come
into direct contact with draglines, and the topmost layer of coal is scraped and partly
crushed during the excavation process. Nevertheless, this direct contact applies only to
a small portion of the coal, and the vast majority remains untouched. We acknowledge
that Sabine might be entitled to a partial sales tax refund, proportionate to that amount of
coal that is directly scraped and crushed by draglines, but it would not be in the spirit of the
legislative intent to grant Sabine a complete refund when nearly ninety percent of the coal
never comes in contact with the draglines. While we may have sympathy for an argument
for a partial refund, Sabine did not file such a claim and concedes that it does not maintain
records which could support such a claim. We, therefore, do not address that argument.

 We find sufficient evidence to support the trial court's conclusion that draglines do
not cause a direct physical or chemical change to manufactured coal, and we overrule
Sabine's first argument.

C. "Actual Manufacturing" Of Marketable coal

 Sabine also argues that there is insufficient evidence to support the trial court's
finding that draglines are not involved in the "actual manufacturing" of marketable coal, as
required by the statute. Tex. Tax Code Ann. § 151.318. The Comptroller argues that the
evidence was sufficient because draglines do not actually manufacture marketable coal
but merely prepare the site for coal removal. The "actual manufacturing," the Comptroller
asserts, occurs later when the coal is processed and made ready to be transformed into
boiler fuel.

 The tax code defines manufacturing as "includ[ing] each operation beginning with
the first stage in the production of tangible personal property and ending with the
completion of tangible personal property having the physical properties (including
packaging, if any) that it has when transferred by the manufacturer to another." Tex. Tax
Code Ann. § 151.318(d). The specific contours of this definition were addressed in Tyler
Pipe and Chevron. Chevron, 924 S.W.2d at 432-33; Tyler Pipe, 919 S.W.2d at 161-63. 
Both cases appeared to adopt an integrated manufacturing standard which assessed
everything that took place inside a plant as part of a "large, integrated" process, and which
interpreted manufacturing far more broadly than the "direct change standard" that was
advanced by the Comptroller. Chevron, 924 S.W.2d at 432-33; Tyler Pipe, 919 S.W.2d
at 161-63. (3)

 As we have noted, however, the Texas legislature was immediately compelled to
overturn both cases. Therefore, we believe it is more faithful to the legislature's intent to
apply the comptroller's logic--the direct change standard--which did not prevail in court,
but which was vindicated in the 1997 amendment section 151.318. If we apply the direct
change standard, as the legislature clearly would have preferred the court do in Tyler Pipe
and Chevron, then Sabine's argument must fail because, as we explained above, draglines
in surface mining do not "directly change" marketable coal.

 We, therefore, find sufficient evidence to support the trial court's finding that
draglines do not "actually manufacture" marketable coal. Sabine is thus not entitled to a
sales tax refund on dragline replacement parts or dragline replacement services on these
grounds either.

IV. Conclusion


 Because we find sufficient evidence to support the trial court's conclusion that
draglines are not a direct cause of physical and chemical changes to marketable coal, nor
do they involve the actual manufacturing of marketable coal, we do not find that draglines
are "property used in manufacturing" such that the Sabine Mining Co. would be entitled to
a sales tax refund on it's purchase of dragline replacement parts. The judgment of the
district court is AFFIRMED.


 _____________________________

 GINA M. BENAVIDES,

 Justice



Memorandum Opinion delivered and

filed this the 23rd day of August, 2007.

1. At the time this appeal was filed, Carol Keeton Strayhorn was the Comptroller of Public Accounts. 
Pursuant to Texas Rule of Appellate Procedure 7.2(a), we have automatically substituted her successor,
Susan Combs, who is the current Comptroller. Tex. R. App. P. 7.2(a).
2. Because we must construe the language of 151.318 so narrowly, we disagree with Sabine's
argument that two cases from outside of Texas are persuasive authority which ought to guide our analysis. 
See Dolese Bros. Co. v. Okla. Tax Comm'n, 64 P.3d 1093, 1101-02 (Okla. 2003); Powhatan Mining Co. v.
Peck, 116 N.E.2d 426, 428-29 (Ohio 1953). Dolese recognizes tax exemptions for machinery that is part of
an "integrated and complementary chain of procedures." Dolese, 64 P.3d at 1101. As we explained above,
the Texas legislature rejected the "integrated standard" when it responded to Chevron in 1997, and therefore,
we do not find the Dolese holding instructive in the instant case. Similarly, we do not find Powhatan instructive
because it recognized tax exemptions for equipment used in the "production of mining," which is different from
the language in section 151.318. Tex. Tax Code Ann. § 151.318. Texas law recognizes exemptions for
equipment which directly changes tangible personal property. Id. This is much narrower than recognizing a
general tax exemption for essentially all acts related to mining as advocated in Powhatan. Therefore, we
believe that Powhatan--like Dolese--is not instructive.

3. Although Chevron specifically adopted the "integrated" standard, the Tyler Pipe court was careful
to avoid adopting the integrated standard in specific terms. Nevertheless, we believe that while the court may
have deliberately eschewed the use of the word "integrated," it clearly applied the logic of the integrated
standard in reaching it's conclusion. Tyler Pipe, 919 S.W.2d at 161-63.