2003 OK 4

**DOLESE BROS. Co. and Roger M. Dolese and Bryan Arnn, as Officers of Dolese Bros. Co. and as Individuals, Protestants/Appellants,**

v.

**STATE OF OKLAHOMA ex rel. OKLAHOMA TAX COMMISSION, Respondent/Appellee.**

No. 96,267.

Supreme Court of Oklahoma.

Jan. 21, 2003.

Robert D. Tomlinson and H. Craig Pitts, McKinney & Stringer, P.C., Oklahoma City, OK, and Robert O. O'Bannon, Phillips McFall McCaffrey McVay & Murrah, P.C., Oklahoma City, OK, for Appellants.

Douglas B. Allen and Marjorie L. Welch, Oklahoma Tax Commission, Oklahoma City, OK, for Appellee.

OPALA, V.C.J.

¶ 1 Three issues are pressed on appeal: (1) Does the manufacturer's exemption from sales and use tax apply to purchases of equipment and property used to remove the

overburden and to place and detonate explosives at appellants' stone manufacturing plants? (2) Does the corporate appellant's method of producing sand constitute manufacturing and if so, does the process of manufacturing sand begin with the removal of the overburden? and (3) Is there record proof that appellants stand relieved of liability for sales tax on transactions that appellants characterize as exempt agricultural sales? We answer the first and second questions in the affirmative and the third in the negative.

## I

## ANATOMY OF LITIGATION

¶ 2 The audit division of the Oklahoma Tax Commission (the Commission) conducted an audit of the books and records of Dolese Bros. Co. (Dolese or the company), an Oklahoma corporation, for the period beginning 1 January 1993 and ending 31 December 1995 (the audit period). Based on the audit, a proposed assessment was issued against Dolese and two of its officers, Roger M. Dolese and Bryan Arnn, individually and in their corporate capacity (collectively taxpayers), for additional sales tax, interest, and penalty in the amount of $271,912.98. A portion of this assessment was attributable to purchases of equipment and property by Dolese on which it paid no sales tax. The remainder was attributable to sales tax that Dolese neither collected nor remitted on certain of its sales. The Commission also proposed to assess taxpayers the sum of $148,424.73 in additional use tax, interest, and penalty on equipment and property purchased outside the state and brought into the state for Dolese's use or consumption.

¶ 3 Taxpayers timely protested the proposed assessments, contending that (a) the purchases made by Dolese on which the Commission based its assessments are exempt from sales tax under the provisions of the manufacturer's exemption, 68 O.S. Supp. 1993, § 1359[1], and from use tax by the provisions of 68 O.S.1991 § 1404(d)[2], and (b) the sales made by Dolese on which the Commission based its assessment are exempt from sales tax by the provisions of the agricultural exemption, 68 O.S. Supp.1993, § 1358.[3]

¶ 4 Several months later, Dolese initiated a proceeding in the Commission to recover the sum of $1,237,368.00 in sales tax paid between 1 January 1993 and 31 December 1996 (the refund-claim period). Dolese claims the tax it seeks to recover was mistakenly paid on purchases that were exempt from taxation under the terms of the manufacturer's exemption. Dolese later reduced the refund claim to the sum of $818,489.00.

¶ 5 The protest and claim for refund were consolidated for adjudication by the Commission and heard by an administrative law judge on 30–31 October 1997. At the conclusion of the hearing, the judge agreed to keep the record open for the parties' post-hearing submission of findings, conclusions, and recommendations and for the receipt of revised exhibits delineating the amounts remaining at issue. Those exhibits show that there remains in controversy (a) the sum of $35,052 with respect to the proposed assessments of sales and use tax[4] and (b) the sum of

---

1. For the relevant provisions of 68 O.S. Supp. 1993, § 1359, *see infra* note 17 and 18.

2. For the pertinent provisions of 68 O.S.1991, § 1404(d), *see infra* note 20.

3. *See infra* note 56.

4. The proposed assessment of sales and use tax consists of the following items::

**Protest Attributable to Stone Manufacturing Plants**

| | |
|---|---|
| Building | $ 1,957.00 |
| Equipment | |
| Stripping | $ 6,168.00 |
| Blasting | $ 322.00 |
| **TOTAL** | **$ 8,447.00** |

**Protest Attributable to Sand Plants**

| | |
|---|---|
| Building | $ 2,566.00 |
| Equipment | |
| Production | $ 8,588.00 |
| **TOTAL** | **$ 11,154.00** |

**Protest Attributable to Sales of Road Building Materials**

| | |
|---|---|
| **TOTAL** | **$ 15,451.00** |

$274,683.00 with respect to Dolese's refund claim.[5]

¶ 6 On 29 January 2001 an administrative law judge submitted to the Commission findings of fact, conclusions of law, and a recommendation for the disposition of the proceeding.[6] The judge concluded that (a) the manufacturer's exemption does not extend to equipment or property used in the removal of the overburden or in the placement and detonation of explosives at a stone manufacturing plant; (2) the production of sand does not constitute "manufacturing;" hence equipment and property used in sand production does not qualify for the manufacturer's exemption; and (3) taxpayers failed to prove that they were entitled to the agricultural exemption for the sales challenged in the audit. The administrative law judge recommended that the protest and claim for refund both be denied. These findings, conclusions, and recommendation were adopted by the Commission. Taxpayers' appeal stands retained for this court's disposition.

## II

## STATUTORY PROVISIONS IN EFFECT AT THE TIME OF THE TRANSACTIONS IN QUESTION, AND NOT SUBSEQUENT AMENDMENTS, APPLY TO TAXPAYERS' PROTEST AND DOLESE'S REFUND CLAIM

■ ¶ 7 The decisions to be made in this case require the application of several provisions of the Oklahoma Sales Tax Code (Sales Tax Code),[7] among which are the statutory definition of manufacturing and the statute creating the manufacturer's exemption. It also rests on the application of a Commission rule outlining the documentation a seller must furnish the Commission in order to obtain relief from liability for uncollected sales tax based upon an exemption. In its order denying taxpayers' protest and Dolese's refund claim, the Commission applied amendments to the relevant statutes that did not take effect until 1 November 1998 and an amendment to the Commission rule that did not take effect until 26 June 1997.[8] Both effective dates occur after the

---

5. Dolese's claim for refund consists of the following items:

| Refund Claim Attributable to Stone Manufacturing Plants | | Refund Claim Attributable to Sand Plants | |
|---|---|---|---|
| Equipment | | Equipment | $ 65,263.00 |
| Stripping | $ 27,581.00 | Electricity | $ 53,432.00 |
| Blasting | $128,407.00 | | |
| **TOTAL** | **$155,988.00** | **TOTAL** | **$118,695.00** |

6. Although Judge Kris Kasper presided at the hearing, the findings, conclusions, and recommendation were prepared by Judge David Allen Miley.

7. The Oklahoma Sales Tax Code is codified at 68 O.S.1991, § 1350 *et seq.*

8. The relevant portion of 68 O.S. Supp.1998, § 1359 states:
"There are hereby specifically exempted from the tax levied by Section 1350 et seq. of this title:
1. Sales of goods, wares, merchandise, tangible personal property, machinery and equipment to a manufacturer for use in a manufacturing operation; ..."
*Cf.* the provisions of the pre-amendatory version of the manufacturer's exemption, 68 O.S. Supp. 1993, § 1359(A) and (C), *infra* notes 17 and 18.
The relevant portion of 68 O.S. Supp.1998, § 1352 states:
"9. "Manufacturing" means and includes the activity of converting or conditioning tangible personal property by changing the form, composition, or quality of character of some

existing material or materials, by procedures commonly regarded as manufacturing, compounding, processing or assembling, into a material or materials with a different form or use. *"Manufacturing" does not include extractive industrial activities such as mining, quarrying, logging, and drilling for oil, gas and water, but may include processes subsequent to extraction if such processes result in a change of the form or use of the material extracted;* ... (emphasis added).
10. "Manufacturing operation" means the designing, manufacturing, compounding, processing, assembling, warehousing, or preparing of articles for sale as tangible personal property. A manufacturing operation begins at the point where the materials enter the manufacturing site and ends at the point where a finished product leaves the manufacturing site. "Manufacturing operation" does not include administration, sales, distribution, transportation, site construction, or site maintenance; ..."

audit and refund-claim periods end. Taxpayers argue that the Commission's retroactive application of the amended statutes and rule was error. Although the Commission now appears to agree,[9] we nevertheless address the issue to prevent the Commission's order that retroactively applies the amended statutes and rule from becoming the settled law of the case.[10]

¶8 As a general rule, statutes and statutory amendments will be construed as operating prospectively unless by express declaration or necessary implication from the language used the Legislature clearly demonstrates a contrary intent.[11] If there is any doubt, it must be resolved against retroactivity.[12] Nothing in the amendatory enactments here at issue expressly declares or necessarily implies a legislative intent that their provisions should be applied to transactions that took place prior to their effective date. The Commission erred in applying the amended statutory provisions.

*Cf.* the provisions of the pre-amendatory definition of manufacturing, 68 O.S. Supp.1993, § 1352(I), *infra* text at page 1101.

The relevant provisions of the 1997 amendment to the Commission exemption documentation rule, OAC 710:65–7–6 (1997), state:

**Vendors' Relief from liability and duty to collect sales tax**

(a) Presumption of taxability. All sales are presumed to be subject to sales tax unless specifically exempted by the Sales Tax Code. Vendors are liable for the sales tax collected as well as for tax that should have been collected.

(b) When vendor may be relieved of liability. A vendor shall be relieved of any liability for the tax and of the duty to collect imposed by Section 1361 of Title 68 of the Oklahoma Statutes if the vendor, in good faith, timely accepts from a consumer, properly completed documentation certified by the Oklahoma Tax Commission that such consumer is exempt from the taxes levied by the Oklahoma Sales Tax Code.

(c) General requirements. Three requirements must be met before the vendor is relieved of liability.

(1) Vendor good faith. Good faith requires that the vendor strictly comply with statutory requirements.

(2) Timely acceptance from a consumer. Timely acceptance from a consumer requires that documentation be in the possession of the vendor at the time the exempt transaction occurs. In the case of continued sales to the same purchaser, the vendor must have, on file, a sales tax permit, card, or exemption letter for each renewal interval. If no renewal interval is provided by statute, the renewal period will be deemed three (3) years, except in the case of entities with specific statutory exemptions who have established eligibility as set out in (d)(5) of this Section.

(3) Properly completed documentation certified by the Oklahoma Tax Commission. Examples of properly completed documentation certified by the Oklahoma Tax Commission are described in (d) of this Section.

(d) Specific applications. The items of information described in (1) through (6) of this subsection constitute minimum requirements to establish 'properly completed documentation certified by the Tax Commission' for each respective category of purchasers.

\* \* \* \* \* \* \* \* \* \*

(4) Sales for agricultural purposes. In the case of a claimed agricultural exemption, the vendor must obtain the items of information set out in this paragraph:

(A) A copy of the agricultural exemption permit card;

(B) A statement that the articles purchased will be used in agricultural production;

(C) Signature of the permit holder or a person authorized to legally bind the permit holder; and

(D) In the circumstances defined in (i) and (ii) of this subparagraph, certification on the face of the invoice or sales ticket is required:

(i) From any person purchasing feed for horses, mules, or draft animals used directly in the production and marketing of agricultural products; or

(ii) From any person who is making purchases of materials, supplies, or equipment to be used in the construction of livestock facilities, including facilities for the production and storage of feed, pursuant to a contract with an agricultural permit holder. [See: § 68 O.S. Supp.1995, 1358(8) and 710:65–13–17].

*Cf.* the provisions of the pre-amendatory version of the Commission exemption-documentation rule, *infra* note 59.

9. Without addressing the reasons for its *volte-face*, the Commission's brief cites only the statutes and rule in effect during the audit and refund-claim periods.

10. The settled-law-of-the-case doctrine operates to bar relitigation in the same case of issues decided in the prior appellate opinion. *Cinco Enterprises, Inc. v. Benso*, 1999 OK 80, ¶10, 995 P.2d 1080,1083–84; *Fent v. Okla. Natural Gas Co.*, 1994 OK 108, ¶14, 898 P.2d 126, 133; *Panama Processes, S.A. v. Cities Serv. Co.*, 1990 OK 66, ¶11, n. 27, 796 P.2d 276, 283, n. 27. The prior opinion settles and determines all questions actually presented and all questions existing in the record and involved in the decision by implication. *Cinco Enterprises, supra; Handy v. City of Lawton*, 1992 OK 111, ¶13, 835 P.2d 870, 873; *Jones v. Medlock*, 1948 OK 188, ¶4, 202 P.2d 212, 213.

11. *Barnhill v. Multiple Injury Trust Fund*, 2001 OK 114, ¶16, 37 P.3d 890, 898; *Houck v. Hold Oil Corp.*, 1993 OK 166, ¶16, 867 P.2d 451, 457.

12. *Barnhill, supra* note 11; *Houck, supra* note 11.

¶ 9 The same rules of construction apply to administrative rules and regulations as to statutes.[13] Generally, substantive administrative rules and regulations apply only to conduct that occurs after their effective date.[14] The Commission has presented the court with no argument that an exception should be made for this case. Hence, the Commission rule on exemption documentation in effect at the time of the sales in question, and not the subsequently-enacted amendment, applies to taxpayers' protest.

## III

## CRUSHED STONE IS PRODUCED IN AN INTEGRATED MANUFACTURING PROCESS THAT INCLUDES THE REMOVAL OF THE OVERBURDEN AND THE PLACEMENT AND DETONATION OF EXPLOSIVES

¶ 10 The Sales Tax Code imposes a tax on non-exempt sales of tangible and intangible personal property and on specified services.[15] The Use Tax Code imposes a tax on tangible personal property purchased outside of Oklahoma if the property is used or consumed here and would have been subject to sales tax had it been purchased in this state.[16] Both codes exempt certain purchases from the tax. The provisions of 68 O.S. Supp. 1993, § 1359, the manufacturer's exemption, exempt from sales tax (a) property purchased for use or consumption in the manufacturing process or that which becomes an integral part of the manufactured article [§ 1359(A)] [17] and (b) machinery and equipment that is purchased by a manufacturer for use in the operation of a manufacturing plant, provided the equipment or machinery is incorporated into, and directly used in, the manufacturing process [§ 1359(C)].[18] A manufacturing plant is defined as an establishment "primarily engaged in manufacturing or processing operations, and generally recog-

13. *Mayfield v. H.B. Oil & Gas*, 1987 OK 106, ¶ 9, 745 P.2d 732, 735.

14. *See e.g. Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result [citations omitted]. By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms" [citations omitted]). *See also Moyer v. Berks County Bd. of Assessment Appeals*, 803 A.2d 833, 842 (Pa.Commw.Ct.2002); *Figueroa v. Director of Dep't. of Labor and Workforce Development*, 54 Mass.App.Ct. 64, 763 N.E.2d 537, 541 (2002); *Appeal of Morrill*, 145 N.H. 692, 765 A.2d 699, 705 (2001).

15. *See* the provisions of 68 O.S.1991, § 1354, as amended, which state in part:

"Tax Levy—Rate—Sales subject to tax.
1. There is hereby levied upon all sales, not otherwise exempted in the Oklahoma Sales Tax Code, Section 1350 et seq. of this title, an excise tax of four and one-half percent (4.5%) of the gross receipts or gross proceeds of each sale of the following: [there follows a list of taxable sales]"

16. *See* the provisions of 68 O.S.1991, § 1402 as amended, which state in part:

"There is hereby levied and there shall be paid by every person storing, using, or otherwise consuming within this state, tangible personal property purchased or brought into this state, an excise tax on the storage, use, or other consumption in this state of such property at the rate of four and one-half percent (4.5%) of the purchase price of such property. . . ."

17. *See* the pertinent provisions of 68 O.S. Supp. 1993, § 1359(A), which state:

"Goods, wares, merchandise, and property purchased for the purpose of being used or consumed in the process of manufacturing, compounding, processing, assembling, or preparing for sale a finished article and such goods, wares, merchandise, or property become integral parts of the manufactured, compounded, processed, assembled, or prepared products or are consumed in the process of manufacturing, compounding, processing, assembling, or preparing products for resale. . . ."

Although § 1359 was amended in 1994, 1995, and 1996, no substantive changes were made to subsection (A) during the audit or refund-claim periods. The designation of the subsections from letters to numbers was effected by Laws 1994, c. 120, § 1, eff. 28 April 1994, with this subsection becoming § 1359.1. Additionally, a stylistic change was made to this subsection by Laws 1996, c. 289, § 5, eff. 1 July 1996.

18. *See* the provisions of 68 O.S. Supp.1993, § 1359(C), which state:

nized as such."[19] The terms of 68 O.S.1991, § 1404(d) provide a similar exemption from use tax.[20]

¶ 11 Dolese operates eight rock quarries in Oklahoma that manufacture crushed stone for use in the construction industry. In *Tulsa Machinery Company v. Oklahoma Tax Commission*,[21] we held that the transformation of rock into crushed stone through the action of various crushers, which pulverize and process the rocks for commercial use, constitutes manufacturing.[22] In that case, we fixed the point at which the process of manufacturing crushed stone commences as the action of the primary crusher.[23] *The question presented here is whether the removal of the overburden from, and the placement and detonation of explosives in, a rock formation—processes that take place before the action of the primary crusher—are part of the process of manufacturing crushed stone.* If they are, the equipment and property used or consumed in those activities are exempt from sales and use tax.

¶ 12 Overburden removal is the first procedure performed on a rock formation from which crushed stone will be produced. The overburden is the layer of earth above the formation consisting of dirt, clay, vegetation, and other extraneous materials. The overburden must be removed in the manufacture of crushed stone in order to prevent contamination of the finished product and interference with the operation of the stone crushing machinery. Removal is accomplished by using bulldozers, front-end loaders, trucks, and chain saws.

¶ 13 After the overburden is removed, holes are drilled in the exposed rock formation and explosives are inserted. The optimum placement of the drill hole, its size, and the amount of explosives to be used are determined according to complex formulas depending upon the type of fragmentation desired. Each hole is detonated separately and sequentially using blasting caps that contain delay elements. The explosives break apart the stone formation creating "shotdown rock," some of which is sold "as is" and some of which undergoes, before being sold, additional crushing procedures.

---

"Sale of machinery and equipment purchased and used by persons establishing new manufacturing plants in Oklahoma and machinery and equipment purchased or equipment built on site and used by persons in the operation of manufacturing plants already established in Oklahoma. This exemption shall not apply unless such machinery and equipment is incorporated into, and is directly used in, the process of manufacturing property for sale or resale. The term manufacturing plants shall mean those establishments primarily engaged in manufacturing or processing operations, and generally recognized as such."

Although § 1359 was amended in 1994, 1995, and 1996, no substantive changes were made to subsection (C) during the audit or refund-claim periods. The designation of the subsections from letters to numbers was effected by Laws 1994, c. 120, § 1, eff. 28 April 1994, with this subsection becoming § 1359.3. A stylistic change was made to this subsection by Laws 1996, c. 289, § 5, eff. 1 July 1996 and by Laws 1995, c. 49, § 5, eff. 9 June 1995, which added an element to the end of the subsection that is not relevant to this proceeding.

19. *Id.*

20. The pertinent terms of § 68 O.S.1991, § 1404(d) of the Use Tax Code are:

"The provisions of this article [Article 14—Use Tax Code] shall not apply:

\* \* \* \* \* \*

(d) in respect to the use of ... machinery and equipment purchased and used by persons to the operation of manufacturing plants already established in Oklahoma. Provided, this exemption shall not apply unless such machinery and equipment is incorporated into, and is directly used in, the process of manufacturing property subject to taxation under Oklahoma Sales Tax Code, Title 68, Article 13. The term "manufacturing plants" shall mean those establishments primarily engaged in manufacturing or processing operations, and generally recognized as such; ..."

21. 1953 OK 52, 253 P.2d 1067.

22. *Id.* at ¶ 9, at 1069.

23. *Id.* at ¶ 9, at 1070 (affirming the Commission's denial of the taxpayer's protest because the machinery, equipment, and repair parts for which the exemption was claimed were used prior to the action of the first crusher).

¶ 14 Citing *Tulsa Machinery,* the Commission ruled in this case that it was precluded from extending the manufacturer's exemption to activities that take place before the stone reaches the primary crusher. The Commission urges the court to reaffirm that holding today, pointing out that the Commission has viewed quarrying activities to be outside the scope of the manufacturer's exemption since 1947, shortly after the manufacturer's exemption was enacted.[24] The Commission also reminds us to heed the rule of statutory construction that tax exemptions are to be strictly construed against the claimant.[25]

¶ 15 Taxpayers, on the other hand, contend that the holding of *Tulsa Machinery* should be revisited in light of recent developments in Oklahoma jurisprudence that enlarge the range of activities deemed to fall within the terms of the manufacturer's exemption.

¶ 16 We first considered the meaning of the term manufacturing in the 1935 case of *Cain's Coffee Company v. City of Muskogee.*[26] In that case we held that a Muskogee city ordinance levying a license tax on merchants could not be levied upon the Cain's Coffee Company because it was a manufacturer, not a merchant. There being no applicable statutory definition of manufacturing in effect at that time, the court looked for guidance to cases from other jurisdictions and adopted the following from the Illinois Supreme Court:

> "[T]he word 'manufacture' is not to be given its technical meaning. The Century Dictionary defines it as 'the production of articles for use from raw or prepared materials by giving these materials new forms, qualities, properties, or combinations, whether by hand labor or machine.' "[27]

Because the case dealt with licensing under a city ordinance, it was not necessary for the court to address where the manufacturing process began or ended. The significance of *Cain's Coffee* is that it defined manufacturing in terms of an activity's transformative effect upon raw or prepared materials in the course of producing a new article for use.

¶ 17 Then in *Tulsa Machinery,* the court held on the authority of *Cain's Coffee* that the transformation of rock into crushed stone constitutes manufacturing, but that equipment which was *not used directly in changing the form of the rocks* was not exempt from sales tax.[28] *Tulsa Machinery* hence stands for the proposition that manufacturing begins with the first action that has a direct transformative effect upon the raw or prepared materials.

¶ 18 We next considered the meaning of manufacturing in *Curry Materials Company v. Oklahoma Tax Commission.*[29] The court again applied the transformative concept of manufacturing, holding that the processes employed by Curry Materials Company in the production of sand were not manufacturing because they did not effect any change in the physical properties of the raw materials but merely altered their location.[30]

¶ 19 The court's first departure from the transformative concept of manufacturing occurred in *Oklahoma Tax Commission v. Oklahoma Coca–Cola Bottling Company,*[31] in which we considered whether the manufacturing of soft drinks included the process of washing the bottles into which the beverage would be placed. Observing that the finished product was the cumulative result of the action of all the machines employed in a modern assembly line, the court held that the bottle washers were "an integral part of the manufacturing process" and as such qualified

24. Commission Order No. 20641, 26 July 1947. Administrative interpretations of a statute by the agency charged with its enforcement should be considered persuasive of the statute's meaning especially when made shortly after the statute's enactment. Walker v. Group Health Services, Inc., 2001 OK 2, ¶ 29, 37 P.3d 749, 760.

25. *R.R. Tway, Inc. v. Okla. Tax Comm'n,* 1995 OK 129, ¶ 26, 910 P.2d 972, 978; *Bert Smith Road Mach. Co., Inc. v. Okla. Tax Comm'n,* 1977 OK 75, ¶ 9, 563 P.2d 641, 643.

26. 1935 OK 450, 44 P.2d 50.

27. *Id.* at ¶ 12, at 52, *quoting from Dolese & Shepard Co. v. O'Connell,* 257 Ill. 43, 100 N.E. 235, 236 (1912).

28. *Tulsa Machinery, supra* note 21 at ¶ 9, at 1069–70.

29. 1957 OK 311, 319 P.2d 292.

30. *Id.* at ¶ 8, at 294–95.

31. 1972 OK 20, 494 P.2d 312.

for the tax exemption.[32] The court concluded that, as long as the enterprise as a whole effected a change in the form, qualities, properties, or combinations of the raw materials, *the separate procedures that make up the production process would be considered manufacturing if they were part of an integrated and complementary chain of procedures that were necessary to the completion of the finished product.* The requirement that the particular procedure in question have a direct transformative effect upon the raw materials was quietly laid to rest.[33]

¶ 20 The Oklahoma Legislature enacted in 1981 a definition of manufacturing.[34] The provisions of 68 O.S. Supp.1993, § 1352(I) state:

" 'Manufacturing' means and includes every operation commencing with the first production stage of any article of tangible personal property and ending with the completion of tangible personal property having the physical properties which it has when transferred by the manufacturer to another."

Implicit in this definition is the requirement that for manufacturing to have occurred there must be some change at the end of the production process in one or more of the properties of the original materials. It is thus consistent with the definition of manufacturing first adopted in *Cain's Coffee.* The

definition also identifies the commencement point of manufacturing as "the first production stage of tangible personal property," but leaves the meaning of that phrase indefinite. What qualifies as the first production stage of a manufacturing operation is precisely the point here at issue.

¶ 21 The court next addressed the scope of the manufacturer's exemption in *Schulte Oil Company, Inc. v. Oklahoma Tax Commission,*[35] holding that sales of diesel fuel to a manufacturer for use in its forklifts qualified for the exemption even though the forklifts did nothing other than move pipe from one place to another.[36] The Commission had taken the position that the forklifts had no "manufacturing effect directly touching" the finished product and hence the fuel used in operating them was not used or consumed in the manufacturing process. In rejecting the Commission's view, we described the applicable analytical framework for the manufacturer's exemption as follows:

"The § 1359 sales tax exemption should receive a practical construction-one that would not allow a manufacturing operation that is in fact but one continuous and integrated production process to be chopped up into distinct and discrete segments. To confine the tax exemption to equipment which actually causes some

---

**32.** *Id.* at ¶ 35, at 317.

**33.** *See McKee Products, Inc. v. State* ex rel. *Okla. Tax Comm'n,* 1989 OK CIV APP 83, 805 P.2d 110, *cert. denied.* The taxpayer, who was engaged in the manufacturing of crushed stone, sought an exemption from sales and use tax for equipment used to clean, sort, and transport rock *after* it had been crushed. The intermediate appellate court, relying principally on this court's pronouncement in *Oklahoma Coca–Cola Bottling,* held that:

"[M]achines and equipment used at the end of the manufacturing process for packaging and delivery are necessary for the sale and distribution of the product. These machines are exempt from tax just as machines used directly in changing the actual form and structure of the product." *Id.* at ¶ 14, at 112.

The court further noted that McKee's manufacturing facility was fully automated and that its machines and equipment acted as a "complement" to each other, so that the company's ability to produce the finished product depended upon the proper operation of each machine and

each piece of equipment in the process. *Id.* at ¶ 16, at 112.

**34.** The definition of manufacturing first appeared as 68 O.S.1981, § 1352(H), Laws 1981, c. 313, § 2, emerg. eff. June 29, 1981. Its letter designation was amended to read § 1352(I) by Laws 1992, c. 172, § 1, emerg. eff. May 5, 1992. The substance of the provision remained unchanged until amended by Laws 1998, c. 301, § 3, eff. Nov. 1, 1998. *See supra* note 8 for the provisions of the 1998 amendment.

**35.** 1994 OK 103, 882 P.2d 65.

**36.** *Id.* at ¶ 25, at 75. The manufacturer in *Schulte Oil* was engaged in the business of re-manufacturing used oilfield pipe and, as a preliminary matter, the court had to decide whether that enterprise constituted manufacturing. We answered that question in the affirmative. *Id.* at ¶ 17, at 72–73. Only then did we go on to determine that the diesel fuel sales qualified for the manufacturer's exemption.

**1102**

physical change in the manufactured product would impose a restriction not warranted by the language of the statute. *We hence hold that within the meaning of § 1359 machinery which is synchronized into the manufacturing operation in a manner that makes it necessary to the production of the finished product is 'directly used in' the manufacturing process."* [37] (emphasis added)

¶ 22 Most recently, we applied this concept in *United Design Corporation v. State ex rel. Oklahoma Tax Commission,* [38] in which we held that an integrated manufacturing process includes "any necessary adjunct to production" as well as any activity "putting the product into marketable form." [39]

■ ¶ 23 Giving due consideration to the points raised by the Commission, we nevertheless agree with taxpayers that *Tulsa Machinery* construes too narrowly the manufacturer's exemption as it applies to the process of manufacturing crushed stone. The record supports Dolese's contention that it employs an integrated manufacturing process at its stone plants, in which the equipment and other property used in the removal of the overburden and in the placement and detonation of explosives play a necessary part.

¶ 24 The Commission argues that even if the equipment and other property at issue are used in an integrated manufacturing process, taxpayers should not prevail because they have failed to prove that overburden removal and the use of explosives to break rock are "generally recognized" as manufacturing. We disagree. The pertinent provisions of § 1359(C) exempts machinery and equipment used in the operation of a manufacturing plant. Manufacturing plants are defined as "those establishments primarily engaged in manufacturing or processing operations, and generally recognized as such." [40] *It is the production process as a whole that must be recognized as manufacturing, not each of its individual component parts. The manufacture of crushed stone has been recognized as manufacturing since our decision in Tulsa Machinery.*

¶ 25 We hence hold that any goods, wares, merchandise, or property used or consumed in overburden removal or explosive placement and detonation at Dolese's stone plants are exempt from sales tax under § 1359(A) and any equipment or machinery so employed are *"directly used"* in the manufacturing process and are exempt from sales tax under § 1359(C). The corresponding section of the Use Tax Code exempts the items from use tax as well.[41]

---

37. *Id.* at ¶ 24, at 74.

38. 1997 OK 43, 942 P.2d 725. United Design, a manufacturer of figurines, argued that its operation is an integrated manufacturing process that begins with design and development and ends with packaging, warehousing, and shipping. The Commission, issuing its order before *Schulte Oil* was decided, viewed United Design's manufacturing process as beginning with the creation of the production molds and ending when each figurine was complete. Describing the Commission's approach as "truncated" and "contrary to the letter and spirit of this Court's decision in *Schulte,"* we remanded the case for the Commission's reconsideration of United Design's manufacturing process in a manner consistent with *Schulte Oil.*

39. *Id.* at ¶ 12, at 727.

40. *See* the provisions of 68 O.S. Supp.1993, § 1359(C), *supra* note 18.

41. Taxpayers also contend that the position they advocate here is consistent with the Legislative purpose in enacting the manufacturer's exemp-

tion, which we have stated "is to enhance this state's competitive position in inducing industries to locate and expand in Oklahoma." *Schulte Oil, supra* note 35 at ¶ 17, at 72. *See also Dairy Queen of Oklahoma v. Okla. Tax Comm'n,* 1951 OK 356, ¶ 8, 238 P.2d 800, 802, where the court notes that the object of the manufacturer's exemption [from use tax] is "to encourage manufacturing industries to locate in the state...." Taxpayers provided testimony and exhibits to the effect that twenty-four of thirty-four states that exempt manufacturing equipment from sales tax include quarrying in their definition of manufacturing. More importantly, taxpayers offered testimony that all the states bordering on Oklahoma exempt quarry equipment from sales and use tax. Yet, with but one exception, taxpayers do not cite any of the specific statutes, rules, or court decisions underlying these assertions. If accurate, such evidence would further support today's pronouncement, but in the absence of citations to the relevant materials, the court will not further explore this basis of support for taxpayers' contention.

IV

## THE PRODUCTION OF SAND AT DOLESE'S PLANTS CONSTITUTES MANUFACTURING AND THE OPERATION IS AN INTEGRATED MANUFACTURING PROCESS THAT BEGINS WITH THE REMOVAL OF THE OVERBURDEN

¶ 26 Dolese owns and operates four sand plants in Oklahoma that produce blended sand for use in making concrete. *As with stone production, the first process in the production of sand is the removal of the overburden from above a sand deposit.* If not removed, the overburden will interfere with later stages of the production process and can contaminate the finished product. A lake or pit with the sand deposit beneath it is then created and a floating dredge suctions slurry, a mixture of sand suspended in water, from the pit. The slurry flows through a pipeline into the processing plant where scalping screens remove extraneous materials. The slurry is then discharged at a high velocity into classifying tanks. As it enters the tanks the slurry hits a large body of stationary water and slows down almost to a stop. Suspended sand particles begin to fall out, the heaviest at the input end of the tank, intermediate sized particles in the middle, and the lightest at the discharge end of the tanks. The different sized particles come to rest in separate blending cells, which fill at nonuniform rates depending on the amount of each particle size entering the classifying tanks. The amount of sand in each blending cell is monitored by a computer, which releases the precise quantity of each sand particle size required for the sand blends produced at the plant. The blended sand is then released into a blade mill for additional cleaning. The blade mill churns the sand in water, rubbing the particles against each other, breaking them down into finer particles, and removing residual mud. The sand is next discharged into dewatering screws, augerlike devices that remove most of the water. From the dewatering screws the sand is deposited onto a conveyor belt, which moves it to a stockpile from which it is sold.

¶ 27 Citing the court's decision in *Curry Materials* that sand production is not manufacturing,[42] the Commission denied taxpayers' protest and Dolese's refund claim for goods and equipment used at its sand plants. The production process in *Curry Materials* consisted of extracting sand in its natural state, washing it for the purpose of removing extraneous organic materials, and subjecting the remaining material to several screenings for the purpose of sorting the material by size.[43] In holding that sand was not being manufactured, we said:

> "[T]here is no crushing and fracturing.... Nor, is there claimed to be any blending of the gravel and sand, or earth conglomerate, with other, or additional, materials as might reasonably be expected to occur in the preparation of coffee, or spices, for human consumption. Instead of there being any change in the form of the gravel and materials saved from the earth by said company, the only change effected by its processing may be regarded merely as a change in the material's surroundings, or locale.... [They] are the same materials they originally were, while a part of the earth, ground, and before their extraction by said company."[44]

¶ 28 Taxpayers argue that *Curry Materials*, decided in 1957, is outdated. They contend that because today's sand production techniques are more complex than they were in the 1950's, sand production has now become a manufacturing operation. They point specifically to the use of computers to monitor the blending process as an example of that complexity. They also point out that the specifications for sand used in concrete today are very different from what they were when *Curry Materials* was decided. The sand produced by the taxpayer in *Curry Materials* would not meet today's specifications and could not be used in modern-day construction projects. Taxpayers contend that while natural sand was the beginning and end product in *Curry Materials*, the blended sand Dolese

**42.** *Curry Materials, supra* note 29 at ¶ 8, at 294.

**43.** *Id.* at ¶ 4, at 293.

**44.** *Id.* at ¶ 8, at 294–95.

produces is distinguishable in form and composition from the raw material coming out of the lake. The Commission maintains that what Dolese does today differs in no material respect from what Curry Materials did a half-century ago. In both instances, the Commission argues, sand goes in and sand comes out and no manufacturing takes place.

¶ 29 We agree with taxpayers that Dolese's sand plants are engaged in manufacturing.[45] In *Cain's Coffee*,[46] the taxpayer acquired green and unprepared coffee, teas, spices and other material which were unfit for human consumption and converted them through human and mechanical labor into products fit for human consumption.[47] Although what began as coffee, tea, and spices ended up as coffee, tea, and spices, we held that the processes applied to the original materials changed their form, qualities, properties, or combinations so as to "manufacture" a new product.[48] In *Tulsa Machinery*,[49] we held that the production of crushed stone by breaking larger pieces of rock into smaller pieces was manufacturing even though the finished product had the same essential properties as the original raw material.[50] In *Schulte Oil*,[51] where we held that the remanufacture of used oilfield pipe constitutes manufacturing, we said of *Cain's Coffee* and *Tulsa Machinery*:

"The salient point in each of these cases is that a product *was* changed into one that became marketable or more usable. Here, the process of rebuilding damaged oilfield pipe transforms a virtually unusable and nonmarketable product into serviceable and saleable merchandise. While it is true that *after* the remanufacturing process is accomplished the end product is still *used oilfield pipe*, the remanufactured article is nonetheless *new and different from the form of the material used in making it.*"[52]

¶ 30 Although natural and blended sand are both sand in their essential properties, the procedures applied by Dolese to the natural form of the material produce tangible personal property—blended sand—that is substantially new and different from that which originally existed. Natural sand is "a virtually unusable and nonmarketable product" in today's construction industry. *Blended sand, although composed of the same materials as natural sand, is "nonetheless new and different from the form of the material used in making it."*

¶ 31 The Commission argues that the manufacturer's exemption does not apply to the manufacture of sand because the facility at which sand is produced is not a "manufacturing plant" as defined by § 1359(C).[53] The Commission argues that sand plants are not "generally recognized" as establishments primarily engaged in manufacturing or processing operations. We disagree. A person with knowledge of what takes place in the production of blended sand today would recognize the operations occurring at a sand production facility as manufacturing.[54]

■ ¶ 32 Taxpayers urge the court to view its sand production operation as an integrated manufacturing process that begins with the removal of the overburden and ends when the product is sold. We agree and hold that any goods, wares, merchandise or property used or consumed in the integrated process of manufacturing sand are exempt from sales tax under § 1359(A) and any equipment or machinery employed at the company's sand plants in these processes are *"directly used"* in the manufacturing process

45. *See* C.P. Jhong, Annotation, *What Constitutes Manufacturing and Who Is a Manufacturer under Tax Laws,* 17 A.L.R.3d 7 (1968).

46. *Supra* note 26.

47. *Id.* at ¶ 8, at 52.

48. *Id.*

49. *Supra* note 21.

50. *Id.* at ¶ 9, at 1069.

51. *Supra* note 35.

52. *Id.* at ¶ 14, at 72.

53. *See* the provisions of 68 O.S. Supp.1993, § 1359(C), *supra* note 18.

54. *Cf. McDonald's Corp. v. Okla. Tax Comm'n,* 1977 OK 74, ¶ 28, 563 P.2d 635, 641 (holding that a fast food restaurant is not generally recognized as a manufacturing plant despite operations that change the composition of the food materials).

and are exempt from sales tax under § 1359(C). The corresponding section of the Use Tax Code exempts the items from use tax as well.

## V

## TAXPAYERS FAILED TO PROVE THAT THEY WERE RELIEVED OF LIABILITY FOR UNCOLLECTED SALES TAX

¶ 33 The provisions of 68 O.S.1991, § 1361 require sellers to collect and remit sales tax on all sales of tangible and intangible personal property as well as on specified services unless the transaction is exempt.[55] Dolese did not collect and remit sales tax on certain transactions because the company claims they were exempt as agricultural sales under the provisions of 68 O.S. Supp.1993 § 1358 (§ 1358 or the agricultural exemption).[56] A proposed assessment was issued on the untaxed transactions in the amount of $15,451.00. Taxpayers protested. The Commission ruled that taxpayers failed to prove that any of the challenged sales qualified for the agricultural exemption and failed to demonstrate that the company had properly documented the sales as required by statute and Commission rule.

■ ¶ 34 The burden of proving that a transaction qualifies for an exemption is on the seller.[57] In connection with that burden, the Legislature has enacted the provisions of 68 O.S.1991 § 1361.1, which state:

"If a vendor, in good faith, timely accepts from a consumer properly completed documentation certified by the Oklahoma Tax Commission that such consumer is exempt from the taxes levied by the Oklahoma Sales Tax Code, the vendor shall be relieved of any liability for any sales tax or the duty to collect any sales tax imposed by the provisions of Section 1361 of this title upon such vendor with respect to such sale."

Compliance with this statute and with the Commission rule implementing it provides a safe harbor for a seller who claims an exemption by affording categorical relief from sales tax liability even if it turns out that the underlying transaction is not exempt.[58]

¶ 35 The Commission has promulgated a rule, OAC 710:65–7–6, to implement this stat-

---

55. *See* the pertinent provisions of 68 O.S.1991, § 1361(A), as amended, which state:

"The tax levied by this article shall be paid by the consumer or user to the vendor as trustee for and on account of this state. . . ."

56. The Commission asserts in its brief that the text of 68 O.S. Supp.1993, § 1358(F) is the exemption provision that applies to the sales in question. Subsection (F) exempts sales of farm machinery, repair parts for farm machinery, and substances used in the operation and maintenance of farm machinery if used directly on a farm or ranch for an agricultural purpose. Taxpayers briefs do not indicate which subsection of § 1358 they contend applies to the sales at issue, but argued to the administrative law judge that 68 O.S. Supp.1995, § 1358.5 and § 1358.8 are the applicable exemption provisions. The provisions of § 1358.5 exempt sales of items to be and in fact used in the production of agricultural products. The provisions of § 1358.8, which were added to § 1358 toward the end of the audit period, exempt sales of materials, supplies, and equipment to be used in the construction of facilities which will be used directly in the production of livestock. *See* Laws 1995, c. 337, § 6, emerg. eff. June 9, 1995. Because we decide this issue against taxpayers on grounds unrelated to the applicable subsection of § 1358, we need not concern ourselves with resolving which sub-

section, if any, actually applies to the sales at issue.

57. *See* the provisions of 68 O.S.1991, § 1365(C), which state in pertinent part:

"The burden of proving that a sale was not a taxable sale shall be upon the person who made the sale."

58. If the underlying transaction is not exempt but the seller is relieved of liability by § 1361.1, the Commission is authorized to pursue the buyer under the terms of the second paragraph of 68 O.S.1991, § 1361(A), as amended, which provides:

"However, if the Oklahoma Tax Commission finds that a consumer or user improperly presented a sales tax permit or other certification or used the property purchased exempt from tax in a manner that would not have qualified for exemption, *the purchaser shall be liable for the remittance of the tax, interest and penalty due thereon and the Tax Commission shall pursue collection thereof from the purchaser in any manner in which sales tax may be collected from a vendor.* Upon such determination, the vendor shall be relieved of any liability for any sales tax imposed by the provisions of this section upon such vendor with respect to such sale." (emphasis added)

ute.[59] In addition to general requirements applicable to any claim of exemption, the rule imposes documentation requirements targeted to specific exemptions. A seller who seeks relief from liability for sales tax under the agricultural exemption must obtain, in addition to a copy of the purchaser's exemption permit or its equivalent, the following items: (a) a statement of the buyer's business, (b) a statement of how the purchased items will be used, (c) the signature of the purchaser or the purchaser's agent, and (d) a certification if required by statute.[60]

¶ 36 The Commission argues that taxpayers failed to present any proof that the product sold in the challenged transactions was directly used on a farm or ranch in agricultural production. Taxpayers argue that if the Commission's argument is sustained, it will be tantamount to imposing a duty upon sellers to follow every purchaser home to make sure the purchased product is put to an exempt use. We disagree. *The Commission appears to us to be saying no more than that the product sold must be one that can be used for an exempt purpose and that the seller must comply with the statutory and regulatory documentation requirements in order to qualify for relief under § 1361.1 and the Commission's rule.* It is unnecessary for us to determine whether the product sold by Dolese in the questioned transactions can be used for an exempt agricultural purpose because taxpayers' failure to show proof of compliance with the documentation requirements of OAC 710:65–7–6 is sufficient to uphold the assessment.

¶ 37 The Commission admits that Dolese obtained for each of the challenged sales a copy of the purchaser's agricultural exemption permit card as required by OAC 710:65–7–6(c)(3)(A),[61] but argues that taxpayers failed to prove that the additional documentation necessary for relief from liability under the agricultural exemption was obtained. This includes most significantly a statement by the purchaser of how the purchased items will be used.

The following will be deemed properly completed documentation certified by the Oklahoma Tax Commission when submitted in appropriate circumstances. All items of information must be legible.

* * *

(3) Agricultural exemption permit card....

**59.** *See* the relevant provisions of OAC 710:65–7–6 (1992), which state:

**Vendors Relief from liability and duty to collect sales tax**

(a) **Presumption of taxability.** All sales are presumed to be subject to sales tax unless specifically exempted by the Sales Tax Code. Vendors are liable for the sales tax collected as well as for tax that should have been collected.

(b) **When vendor may be relieved of liability.** A vendor shall be relieved of any liability for the tax and of the duty to collect imposed by Section 1361 of Title 68 of the Oklahoma Statutes if the vendor, in good faith, timely accepts from a consumer, properly completed documentation certified by the Oklahoma Tax Commission that such consumer is exempt from the taxes levied by the Oklahoma Sales Tax Code.

(1) **General Requirements.** Three requirements must be met before the vendor is relieved of liability:

(A)**Vendor Good Faith.** Good faith requires that the vendor strictly comply with statutory requirements.

(B)**Timely acceptance from a consumer.** Timely acceptance from a consumer requires that documentation be in the possession of the vendor at the time the exempt transaction occurs. In the case of continued sales to the same purchaser, the vendor must have, on file, a sales tax permit, card, or exemption letter for each renewal interval. If no renewal interval is provided by statute, the renewal period will be deemed three (3) years.

(C) **Properly completed documentation certified by the Oklahoma Tax Commission.**

**60.** *See* Okla. Admin. Code § 710:65–7–6(c)(3)(A–E) (1992), which provides:

(3) **Sales for Agricultural Purposes.** In the case of a claimed agricultural exemption, the vendor must obtain items (A) through (E):

(A) Agricultural exemption permit card information may consist of:

(i) A **copy** of the agricultural exemption permit card; **or**

(ii) In lieu of a copy of the card, obtain the following:

(I) Name and address of the purchaser; and

(II) Federal employer's identification number; ASCS number, or other identifying number of purchaser;

(B) Statement of the purchaser's business;

(C) Statement of how the articles purchased will be used;

(D) Signature of the purchaser or a person authorized to legally bind the purchaser;

(E) Certificate, on the face of the invoice, if required by statute.

**61.** *Id.*

¶ 38 *Dolese admits that none of the invoices bearing the allegedly-missing information is included in the record,* but nevertheless contends that the record contains evidence that the information was in fact acquired. Specifically, taxpayers argue that the company obtained a signed, rubber-stamped certification on each of the contested invoices stating that the purchaser is engaged in farming or ranching and that the product purchased would be used only in the farming or ranching operation. Taxpayers physically reproduce this rubber-stamped certification in their brief, but their argument is clearly *without record support.* A deficient record may not be supplemented by material physically attached to a party's appellate brief.[62]

¶ 39 Taxpayers also rely on two exhibits which they claim provide record support for their assertion that the requisite documentation was obtained. First, they direct our attention to the work papers prepared by the Commission's auditor, in which the letters "SG", "SIG", "SIGN", "SIGND", or "SIGNED" appear next to an abbreviated description of the articles sold.[63] No testimony was introduced explaining the meaning or significance of these notations and there is no record support for the proposition that they represent a signed statement of the purchaser's business and of the use to which purchased items will be put.

¶ 40 Taxpayers also rely on the following testimony of the Commission's auditor with respect to his receipt of documentation: "... as I was able to validate the farm card number and the customer had signed for agricultural use, then I removed those items from the work papers." We fail to see how this supports taxpayers' contention since the witness appears to be saying that he removed from the assessment sales for which

he was given evidence that the purchaser had signed for agricultural use.

¶ 41 Without record support of its compliance with the documentation required by statute and Commission rule, taxpayers' protest of the assessment on its sales was properly denied. We hence affirm that portion of the Commission's order.

## VI

## SUMMARY

¶ 42 The manufacture of crushed stone is an integrated manufacturing process *that includes* the removal of the overburden and the placement and detonation of explosives. Property used in these processes qualifies for the manufacturer's exemption from sales and use tax and we reverse the Commission's order denying taxpayers' protest and Dolese's refund claim insofar as it relates to these activities. Dolese's production of blended sand constitutes manufacturing and the manufacture of sand is an integrated manufacturing process, which begins with the removal of the overburden above a sand deposit. Property used in the manufacture of sand qualifies for the manufacturer's exemption from sales and use tax and we reverse the Commission's order denying taxpayers' protest and Dolese's refund claim insofar as it relates to the production of sand at Dolese's plants. Taxpayers failed to prove that Dolese complied with the documentation requirements imposed by statute and by the Commission's rule on sales claimed to qualify for the agricultural exemption. We hence affirm the Commission's denial of that portion of taxpayers' protest.

¶ 43 THE OKLAHOMA TAX COMMISSION'S ORDER IS AFFIRMED IN PART AND REVERSED IN PART; CAUSE REMANDED FOR IMPLEMENTATION OF

---

62. *Frey v. Independence Fire & Casualty Co.,* 1985 OK 25, ¶ 7, 698 P.2d 17, 20 ("In short, there can be no post-decisional amendment of the record to include material that was not timely admitted or properly pressed for incorporation at the trial level."). *See also* Rule 1.28(b), Oklahoma Supreme Court Rules, 2001 O.S., App. 1., which states in pertinent part:

"Materials which were not before the trial court at the time of the decision appealed are

not properly part of the record on appeal without order of the trial court or the appellate court...."

63. For example:

*Items Purchased*
23.65 ⅜"SCRGS SIGN
13.95 1½" CR SIG
8.45T ¾" CR SIGND
14.3 1½CORS ST SG

TODAY'S OPINION BY AN ORDER CONFORMING TO THE COURT'S PRONOUNCEMENT.

¶44 ALL JUSTICES CONCUR.