TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-97-00265-CV






John Sharp, Comptroller of Public Accounts for the State of Texas; Dan Morales,


Attorney General of the State of Texas; and Martha Whitehead,


Treasurer of the State of Texas, Appellants



v.



Clearview Cable TV, Inc., Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT


NO. 96-04739, HONORABLE HUME COFER, JUDGE PRESIDING 







 Appellee Clearview Cable TV, Inc. ("Clearview") (1) filed suit against appellants (2) (collectively
the "Comptroller') in district court seeking a refund of sales tax paid under protest. See Tex. Tax Code
Ann. §§ 112.001 et seq. & 151.001 et. seq. The disputed tax concerns the purchase of equipment
Clearview used to provide cable service to its subscribers. The district court rendered judgment ordering
the Comptroller to refund $439,592.29 to Clearview. The Comptroller appeals. We will affirm.


THE CONTROVERSY


 Clearview is a wireless cable television company. It provides cable service to its
subscribers by purchasing and installing the following five pieces of equipment on the subscriber's premises: 
an antenna, a down converter, connecting wire, a power supply unit, and a set top converter. To fully
understand the issue presented in this case, we must first describe how these pieces of equipment work
together to provide a functioning cable service to Clearview's subscribers.

 Outside the subscriber's home, an antenna receives a microwave signal which the down
converter converts into a signal that can be received by the subscriber's television set. A connecting wire
runs from the antenna and down converter into the subscriber's home and connects with the power supply
unit and set top converter. The power supply unit is then plugged into an electrical outlet inside the
subscriber's home to provide the antenna and down converter the electricity needed to receive and convert
the microwave signal. Finally, the set top converter is connected by a cable wire to the television set,
allowing the subscriber to change channels as well as to program or block certain channels.

 Claiming that it was entitled to the benefit of the "Sale for Resale" tax exemption, Clearview
purchased all of the aforementioned equipment tax-free from various vendors. See Tex. Tax Code Ann.
§§ 151.006, .302(b) (West 1992).

 The Tax Code defines "Sale for Resale," (3) in part, as a sale of

. . . .


(3) tangible personal property to a purchaser who acquires the property for the purpose
of transferring it. . .as an integral part of a taxable service.



Tex. Tax Code Ann. § 151.006 (West 1992) (emphasis added). Section 151.302 of the Tax Code
provides, in part, that:


(a) The sale for resale of a taxable item is exempted from the taxes imposed by this
chapter.


(b) Tangible personal property used to perform a taxable service is not considered resold
unless the care, custody, and control of the tangible personal property is transferred
to the purchaser of the service.



Tex. Tax Code Ann. §151.302(b) (West 1992) (emphasis added).

 Therefore, believing that it "transferred" "care, custody, and control" of all equipment to
its subscribers "as an integral part of a taxable service," Clearview contended it was entitled to purchase
each piece of equipment tax-free. However, the Comptroller disagreed, in part, with Clearview's position.

 Although the Comptroller agreed that each piece of the equipment was an integral part of
a taxable service and that "custody" of all equipment was transferred to Clearview's subscribers, it
disagreed with Clearview that "care" and "control" of the antenna, down converter, and connecting wire
(hereinafter "the Outside Equipment") were transferred to Clearview's subscribers as required by section
151.302(b). The Comptroller did not contest Clearview's position regarding the power supply unit and
set top converter.

 Clearview paid the sales tax on the Outside Equipment under protest and brought suit in
district court seeking a refund of the protested tax paid. See Tex. Tax Code Ann. § 112.001 (West 1992). 
The trial court found that, pursuant to section 151.302(b), Clearview had, in fact, transferred "care,
custody, and control" of the Outside Equipment to its subscribers and ordered the Comptroller to refund
Clearview $439,592.29 plus interest on that amount. The Comptroller appeals.


DISCUSSION

 In four points of error, the Comptroller argues that the trial court erred in finding that
Clearview was entitled to the benefit of the "Sale for Resale" exemption for the Outside Equipment. As
the threshold issue, the Comptroller disagrees with the trial court that "care and control" of the Outside
Equipment was transferred to Clearview's subscribers as required by section 151.302(b) of the Tax Code. 
Therefore, in order to resolve this dispute, we must interpret what it means to transfer to a "purchaser" of
a taxable service the "care" and "control" of equipment used to provide that "taxable service." See Tex.
Tax Code Ann. § 151.302(b).

 It is well settled in Texas that tax exemptions are strictly, but reasonably, construed against
the taxpayer. See North Alamo Water Supply Corp. v. Willacy County Appraisal Dist., 804 S.W.2d
894, 899 (Tex. 1991); Sharp v. Tyler Pipe Indus., Inc., 919 S.W.2d 157, 161 (Tex. App.--Austin
1996, writ denied) (statutes exempting property from taxation should be strictly construed in favor of
taxation, but should not be interpreted unreasonably); Sharp v. Chevron Chem. Co., 924 S.W.2d 429,
432 (Tex. App.--Austin 1996, writ denied); Quorum Sales, Inc. v. Sharp, 910 S.W.2d 59, 61 (Tex.
App.--Austin 1995, writ denied). However, our primary rule in statutory interpretation is to look at the
intent of the legislature and construe the statute so as to give effect to that intent. Union Bankers Ins. Co.
v. Shelton, 889 S.W.2d 278, 280 (Tex. 1994); Monsanto Co. v. Cornerstones Mun. Util. Dist., 865
S.W.2d 937, 939 (Tex. 1993); Tyler Pipe, 919 S.W.2d at 161.


The Statutory Scheme

 The "Sale for Resale" exemption was put into the Tax Code to prevent double taxation. 
See East Texas Oxygen Co. v. State, 681 S.W.2d 741, 745 (Tex. App.--Austin 1984, no writ). The
application of the exemption is best exemplified by the transfer or sale of merchandise from wholesaler to
retailer to consumer. Retailers are allowed to purchase goods tax- free from wholesalers because the Tax
Code recognizes that the consumer will ultimately own and pay sales tax on the goods purchased from
the retailers. See id. In other words, the Tax Code recognizes that the same goods should not be taxed
twice; only the ultimate owner of the goods should be burdened by the sales tax. See id. Similarly, when
the Tax Code provided for the taxing of cable services, it recognized that in addition to a cable company's
charge for the actual microwave signal received by the subscriber, a subscriber's cable bill would also
include an amount necessary to recoup the cost of any equipment needed to receive the microwave signal. 
Therefore, in order to prevent taxing both the cable operator and its subscribers for the same equipment
necessary to provide cable service, the "Sale for Resale" exemption was expanded to exempt from sales
tax "tangible personal property used to perform a taxable service." See Tex. Tax Code Ann. § 151.302
(West 1992).


Ownership v. Possession

 Under the Tax Code, the sale for resale exemption is applied differently to "tangible
personal property used to perform a taxable service" than it is to taxable goods transferred from retailers
to consumers. Unlike the classic "sale for resale" transaction where the ownership of the taxable item is
actually transferred from the retailer to the consumer, ownership of the equipment used to provide a taxable
service, such as a cable service, remains with the cable company. In other words, while possession of the
equipment may ultimately be transferred to the cable subscriber, ownership remains with the cable provider. 
In addition, unlike retailers and their customers, there is a tacit assumption between the cable company and
its subscribers that at some time in the future the subscriber or cable provider may terminate the cable
service contract; whereupon, the cable company will reclaim its equipment. Therefore, unlike a retailer who
relinquishes all ownership in taxable goods sold to the ultimate consumer, the cable company retains a
vested ownership interest in the cable equipment during the term of its service rental agreement with its
subscriber. (4)

 In construing the requirement of the Tax Code that a transfer of "care, custody, and
control" is required to trigger the exemption, we must be mindful of the fact that the owner of the equipment
is only transferring possession and will continue to exercise some degree of ownership rights in the
property. To the extent that the Comptroller's construction of the term "care, custody, and control"
requires a complete divestiture by the owner of all rights in the property, such a construction would be
unreasonable.


Care & Control

 The Comptroller has made some important concessions in this case. The Comptroller
concedes that the requirement of transfer of "custody" within the exemption has been satisfied by Clearview
as to all of the equipment used to provide cable service. In addition, the Comptroller concedes that
Clearview has even satisfied the "care" and "control" requirements regarding the equipment used inside the
home, i.e., the power supply unit and the set top converter. Based upon these concessions and armed with
the undisputed fact that all five pieces of equipment are only operational as an integrated unit, Clearview
contends that the Comptroller has virtually conceded the applicability of the exemption. While we think
that Clearview makes a convincing argument, we must agree with the Comptroller that a technical reading
of the Tax Code requires us to view each piece separately for purposes of applying the exemption. We
observe, however, that the integrated nature of the entire unit is strong evidence that the Comptroller's
position appears to be logically inconsistent -- that the inside equipment is tax- exempt while the Outside
Equipment is not. In any event, we will analyze whether the Comptroller's attempted distinction is sound
based upon this record.

 The Comptroller contends that one who has care and control of the Outside Equipment,
respectively, has the "responsibility for servicing and maintaining the equipment" and has "authority to
manage and guide the use of the equipment." These definitions, however, are unreasonable for several
reasons. First, these definitions do not take into account the fact that both Clearview and the subscribers
are going to have some degree of joint care and control over the equipment. Clearview will always have
an interest in "servicing, maintaining, managing, and guiding" the equipment because, as a service provider
and the owner of valuable equipment, it has an interest in delivering to its subscribers quality cable service
and having its equipment returned in the best possible condition. Likewise, as discussed below, the
subscribers, as possessors of the equipment and users of the service, inherently have a right to control the
equipment and are contractually bound to "properly care" for it as well. For example, paragraph 5(a) of
the subscription agreement provides in part:


CARE OF EQUIPMENT. Subscriber shall properly care for [CLEARVIEW'S]
equipment and shall not suffer or permit any damage, removal, or alteration of equipment.



 Second, under the Comptroller's definition of "care" and "control," Clearview would have
to completely divest itself of all care and control of property it owns in order to assert the benefit of the
tax exemption. Such actions are unreasonable and would be detrimental to both Clearview and its
subscribers. Requiring a complete divestiture of "care and control" over one's own equipment would write
the exemption out of the statute and is not reflective of the realities of the marketplace.

 In light of the statutory scheme described above, we believe that a more reasonable
interpretation of section 151.302(b) is to determine who has primary possession of the Outside
Equipment. Primary possession is determined by examining who primarily controls and cares for such
equipment. Such an analysis will more clearly reflect who should be burdened by the sales tax.

 Under the facts of the present case, it appears that the subscriber primarily "controls" the
Outside Equipment. It is the subscriber, not Clearview, that determines: (1) when the equipment can be
used; (2) how long the equipment can be used; and (3) what, if any, programming is going to be received
by the antenna and converted into a signal that can be received by the subscriber's television set. The
subscriber controls all of these factors because the subscriber controls the ultimate piece of the integrated
system: the power supply. Moreover, the subscriber, not Clearview, determines who can use the
equipment and where the equipment should be placed. Therefore, we hold that Clearview has transferred
primary control of the Outside Equipment to its subscribers.

 We next address who primarily "cares" for the Outside Equipment. As stated above, the
subscribers are contractually bound to "properly care" for the Outside Equipment. "Properly" caring for
the equipment essentially means that the subscriber, as possessor of the equipment, has the primary
responsibility not to intentionally harm or damage the equipment. To some extent, the primary care
exercised by the subscribers is that of benign neglect; to simply leave the equipment in place and
undisturbed. In contrast, Clearview's care for the equipment is purely reactionary. Clearview will "care"
for the equipment when it is notified that the equipment is defective, damaged, lost, or stolen. (5)
 Therefore,
we hold that the subscribers, not Clearview, primarily care for the Outside Equipment.


CONCLUSION

 Given this analysis, we conclude that the trial court did not err in determining that Clearview
effectively transferred care and control of the Outside Equipment to its subscribers and hold that Clearview
is entitled to the sales tax refund ordered by the trial court. We overrule the Comptroller's four points of
error and affirm the judgment of the district court.



 

 Mack Kidd, Justice

Before Chief Justice Carroll, Justices Jones and Kidd

Affirmed

Filed: January 23, 1998

Publish
1. Clearview is actually the assignee of a tax refund claim by Technivision, Inc., which did business as
Omnivision of Corpus Christi, a wireless cable television company. The transactions described below
were actually conducted between Technivision and the Comptroller. However, for the sake of simplicity
we will refer to Clearview as the acting entity instead of Technivision. 
2. Appellants are John Sharp, Comptroller of Public Accounts for the State of Texas; Dan Morales,
Attorney General of the State of Texas; and Martha Whitehead, Treasurer of the State of Texas.
3. The terminology "sale for resale" is somewhat confusing under these facts. The resale is not of the
equipment purchased by Clearview, but rather the rental of the equipment and cable services upon which
sales tax is collected. Thus, under these facts the "sale for resale" exemption is in application a sale for
rental or lease exemption. 
4. In fact, the Subscription and Rental Agreement between Clearview and Clearview's subscribers
provides that the property used to provide cable service remains the property of Clearview.
5. Paragraph 5(a) of the subscription agreement:


SUBSCRIBER shall immediately notify [CLEARVIEW] of any defect in or any damage, loss
or theft involving [CLEARVIEW's] equipment.




Second, under the Comptroller's definition of "care" and "control," Clearview would have
to completely divest itself of all care and control of property it owns in order to assert the benefit of the
tax exemption. Such actions are unreasonable and would be detrimental to both Clearview and its
subscribers. Requiring a complete divestiture of "care and control" over one's own eq