# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00747-CV

**United Services Automobile Association and USAA Life Insurance Company, Appellants**

**v.**

**Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas, and Greg Abbott,[1] Attorney General of the State of Texas, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. GN103414, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## O P I N I O N

This appeal concerns a tax refund claimed under repealed sections of the Texas Insurance Code. Appellants United Services Automobile Association and USAA Life Insurance Company (collectively, USAA) argue that repealed language in the Texas Insurance Code providing that "no other tax" than a gross receipts tax would apply to insurance companies operated to exempt them from paying all forms of state tax not expressly provided for in the insurance code at that time. Consequently, USAA seeks a refund from the Comptroller for all sales and use taxes it paid for taxable transactions from 1994 through 1999. The district court denied USAA's motion for summary judgment and granted the Comptroller's motion for summary judgment, declaring that the

---

[1] The notice of appeal in this case named the previous attorney general of Texas, John Cornyn, as appellee. We have substituted the name of the current attorney general of Texas, Greg Abbott. *See* Tex. R. App. P. 7.2(a).

disputed provisions of the insurance code did not exempt USAA from sales and use taxes. On appeal, USAA argues in one issue that the district court misinterpreted the plain meaning of the former statutes and should have exempted it from paying sales and use taxes. We affirm the judgment of the district court.

## BACKGROUND

Although this dispute concerns provisions of the insurance code as they existed from 1994 to 1999, its roots reach deep into the history of tax policy in Texas. *See* Act of June 17, 1993, 73d Leg., R.S., ch. 685, § 3.11, 1993 Tex. Gen. Laws 2559, 2583-84 (hereinafter cited as Former Tex. Ins. Code art. 4.10); Act of July 13, 1984, 68th Leg., 2d C.S., ch. 31, § 4, art. 4, sec. 1, 1984 Tex. Gen. Laws 193, 215-21 (hereinafter cited as Former Tex. Ins. Code art. 4.11).[2] Thus, we begin our inquiry with the origin and development of the tax exemption language found in former articles 4.10 and 4.11.[3] Originally, insurance companies, like other businesses, were subject to a general

---

[2] We will refer to the versions of the articles from the Insurance Code in force from 1994 to 1999 as "former article 4.10" and "former article 4.11." Before codification, the earlier versions of former articles 4.10 and 4.11 were found in the Texas Revised Civil Statutes as articles 7064 and 7064(a).

[3] The relevant sections of former articles 4.10 and 4.11 provided:

Art. 4.10

Sec. 1. Every insurance carrier, including Lloyd's and reciprocal exchanges and any other organization or concern receiving gross premiums from the business of fire, marine, marine inland, accident, credit, livestock, fidelity, guaranty, surety, casualty, workers' compensation, employers' liability, or any other kind or character of insurance, except title insurance and as provided in Sections 2, 3, and 4 of this article, shall pay to the comptroller for transmittal to the state treasurer a tax upon such gross premium receipts as provided in this article. . . .

\* \* \*

2

Sec. 14. No occupational tax shall be levied on insurance carriers or companies herein subjected to this premium receipts tax by any county, city, or town. The taxes in this article shall constitute all taxes collectible under the laws of Texas and assessed by the commissioner and administered by the comptroller. Farm mutuals, local mutual aid associations and burial associations are not subject to the franchise tax.

No other tax shall be levied or collected from any insurance carrier by the state, county, or city or any town, but this law shall not be construed to prohibit the levy and collection of state, county, and municipal taxes upon the real and personal property of such carrier.

Act of June 17, 1993, 73d Leg., R.S., ch. 685, § 3.11, 1993 Tex. Gen. Laws 2559, 2583-84 (hereinafter cited as Former Tex. Ins. Code art. 4.10).

Art. 4.11

Sec. 1. Every insurance carrier receiving premiums from the business of life insurance, accident insurance, health insurance, life and accident insurance, life and health insurance, health and accident insurance, or life, health, and accident insurance, including variable life insurance, credit life insurance, and credit accident and health insurance for profit or otherwise or for mutual benefit or protection, in this state, shall pay to the State Board of Insurance for transmittal to the state treasurer an annual tax on its gross premiums as provided in this article.

* * *

Sec. 9. The taxes aforesaid shall constitute all taxes and license fees collectible under the laws of this state from any such insurance organization organized under the laws of this state, except, and only except, unemployment compensation taxes . . .; and the fees provided for under Article 4.07, Insurance Code, the deposit fees described by that article and amendments to it; and in case of companies writing workers' compensation insurance, the taxes otherwise provided by law on account of such business; and no other taxes shall be levied or collected by the state or any county, city, or town except state, county, or municipal ad valorem taxes upon real and personal property of such insurance organization.

No other tax shall be levied or collected from any insurance carrier by the state, county, or city or any town, but this law shall not be construed to prohibit the levy and collection of state, county, and municipal taxes upon the real and

3

license tax. *See* Edmund Thornton Miller, *A Financial History of Texas* 294-300 (1916). By 1880, the legislature created a system of occupation or franchise taxes to replace the license taxes of corporations. *See id.* at 301. The legislature replaced the occupation tax on insurance companies with a gross premiums tax in 1893.[4] Act approved May 11, 1893, 23d Leg., R.S., ch. 102, § 1, 1893 Tex. Gen. Laws 156, 156, *reprinted in* 10 H.P.N. Gammel, *The Laws of Texas 1822-1897*, at 586, 586 (Austin, Gammel Book Co. 1898). In doing so, the legislature denied cities, counties, and towns the power to levy other "occupational" taxes on insurance companies. *Id.*; *see also* Miller, *supra*, at 307. From 1893 to 1897, Texas experienced a deep financial depression, and the populist party, experiencing the period of its greatest strength in 1894, advocated a heavier taxation of corporations. Miller, *supra*, at 313; *see also* Alwyn Barr, *Reconstruction to Reform: Texas Politics 1876-1906* 143-60 (1971).

In 1905, the legislature began shifting the tax burden away from farmers and other landowners by continuing to raise taxes on corporations. *See* Barr, *supra*, at 234; *see also* Miller,

---

personal property of such carrier.

Act of July 13, 1984, 68th Leg., 2d C.S., ch. 31, § 4, art. 4, sec. 1, 1984 Tex. Gen. Laws 193, 215-21 (hereinafter cited as Former Tex. Ins. Code art. 4.11).

[4] A gross premiums tax is a tax based on a percentage of the gross receipts an insurance company receives from premiums paid on policies. *See, e.g.*, Tex. Ins. Code Ann. art. 4.10, §§ 1, 5, 10 & art. 4.11, §§ 1, 2(c), 5 (West Supp. 2003). "Occupation tax" is a general term describing all taxes imposed for the purpose of "allowing . . . companies to pursue their business in Texas," and gross premiums taxes are a kind of occupation tax. *See Millers' Mut. Fire Ins. Co. v. City of Austin*, 210 S.W. 825, 827 (Tex. Civ. App.—San Antonio 1919, no writ); Edmund Thornton Miller, *A Financial History of Texas* 215-19 (1916) (describing the development of occupation taxes in Texas after Reconstruction). "Franchise tax" refers to a tax levied on the value of the privilege to conduct business in this state with a particular trademark and is also a type of occupation tax. *See Bullock v. National Bancshares Corp.*, 584 S.W.2d 268, 270 (Tex. 1979); *Upjohn Co. v. Rylander*, 38 S.W.3d 600, 603 (Tex. App.—Austin 2000, pet. denied).

*supra*, at 301-10 (outlining the development of various occupation and franchise taxes from 1881 to 1915). From 1905 to 1907, the legislature refined the method of taxing insurance companies on their gross receipts by gradually increasing the tax rates. Miller, *supra*, at 313-14. This movement culminated in 1907 when the legislature passed the act that included the earliest version of article 4.10. *See* Act approved May 16, 1907, 30th Leg., 1st C.S., ch. 18, § 8, 1907 Tex. Gen. Laws 479, 482 (Act approved May 16, 1907). In that statute, the legislature instituted a comprehensive reform of the occupation taxes levied on railroads, owners of railroad cars, telegraph operators, gas, electric and water providers, owners of stock cars, owners of oil or gas lines, mineral dealers, public transportation providers, producers of intoxicating beverages, gun dealers, and printers of textbooks and law books, among others. *See id*. §§ 1-7. It also overhauled its approach to occupation taxes on insurance companies. *See id*. § 8.

As part of that general reform in 1907, the legislature adopted a specialized tax on each of the affected industries as *the* occupational tax for that industry. *See, e.g.*, *id*. §§ 1-3 (imposing gross receipts taxes as the occupation taxes on railroads, telegraph operators, and gas, electric, and water providers). When considering occupational taxes on rail car companies, for example, the legislature expressly provided that the new gross receipts tax would be "in lieu of all other taxes now levied" on that industry. *Id*. § 7. Finally, within this context of occupation tax reform, the legislature created a detailed approach to levying taxes on insurance companies. *Id*. § 8. In doing so, the legislature exempted the affected insurance companies from all taxes and license fees then "collectable" [sic] against them and directed that no occupation or other taxes, except for taxes on real and personal property, could be levied by counties, cities, and towns. *Id*.

5

The legislature has amended this statute several times over the past ninety-six years. *See, e.g.*, Act of Oct. 31, 1936, 44th Leg., 3d C.S., ch. 495, art. 4, § 5, 1936 Tex. Gen. Laws 2040, 2074 (Act of Oct. 31, 1936); Act of June 6, 1951, 52d Leg., R.S., ch. 402, § XV, sec. 1, 1951 Tex. Gen. Laws 695, 710-12 (Act of June 6, 1951). In 1981, the legislature included this statute in the new insurance code as article 4.10. *See* Act of May 29, 1981, 67th Leg., R.S., ch. 389, § 36, art. 4.10, sec. 5, 1981 Tex. Gen. Laws 1780, 1782 (Act of May 29, 1981). Significantly, the language concerning occupation taxes, gross receipt taxes, and exemptions remained unchanged. *Compare* Act approved May 16, 1907, ch. 18, § 8, *and* Act of Oct. 31, 1936, ch. 495, art. 4, § 5, *with* Act of May 29, 1981, ch. 389, § 36, art. 4.10, *and* Act of June 17, 1993, ch. 685, § 3.11.

Although the legislature originally created one gross receipts tax rate for all insurance companies, in 1936 it passed the first version of article 4.11 to create a separate gross receipts tax rate for life, health, and accident insurance companies. *See* Act of Oct. 31, 1936, ch. 495, art. 4, §§ 5b; Act approved May 16, 1907, ch. 18, § 8. In doing so, the legislature also adopted the occupation-tax exemption language and applied it in the new statute. *See* Act of Oct. 31,1936, ch. 495, art. 4, § 5b. Although multiple minor amendments have occurred over time, none changed the language concerning gross receipts taxes or exemptions. *See, e.g.*, Act of May 20, 1971, 62d Leg., R.S., ch. 406, § 1, 1971 Tex. Gen. Laws 1535, 1535-37 (Act of May 20, 1971). The legislature transferred this newer statute to the insurance code as article 4.11 at the same time that it codified article 4.10 and did not alter the language of the gross receipts tax or of the exemptions. *Compare* Act of May 20, 1971, ch. 406, § 1, *with* Act of May 29, 1981, ch. 389, § 36, art. 4.11. Finally, in

6

2001, the legislature removed the tax exemption language at issue in this case. *See* Act of May 26, 2001, 77th Leg., R.S., ch. 763, §§ 3, 5, 2001 Tex. Gen. Laws 1501, 1502, 1503.

No sales or use taxes existed in Texas when the legislature created the gross receipts tax system in 1907. Rather, the legislature created the "broad-based" sales and use tax system in 1961 as a way to raise revenue for educational and health facilities. *See* Act of Aug. 8, 1961, 57th Leg., 1st C.S., ch. 24, 1961 Tex. Gen. Laws 72 (current version at Tex. Tax Code Ann. §§ 151.001-.713 (West 2002 & Supp. 2003)); James R. Soukop et al., *Party and Factional Division in Texas* 10-11 (1964). The attorney general has interpreted the sales and use tax statutes as applying to insurance companies since at least 1968. *See* Op. Tex. Att'y Gen. No. M-188 (1968). Since 1961, USAA paid both the gross receipts taxes as required by articles 4.10 and 4.11 and sales and use taxes as required by chapter 151 of the tax code.

On January 12, 2000, USAA filed claims with the Comptroller for a tax refund of sales and use taxes, motor fuel taxes, taxes on the sale, rental, and use of motor vehicles, the telecommunications infrastructure fund assessment, and other taxes in the approximate amount of $200,000,000 plus interest. *See* Tex. Tax Code Ann. § 11.104 (West 2001). USAA then filed this suit and ultimately limited its claim to include a refund only for sales and use taxes paid from 1994 through 1999, totaling $120,447,142. The Comptroller countersued, seeking a declaratory judgment that the "no other tax" language in former articles 4.10 and 4.11 referred only to occupation and franchise taxes. The district court denied USAA's claim and declared in a final judgment that the payment of gross receipts taxes under former articles 4.10 and 4.11 did not exempt USAA from paying sales and use taxes. This appeal followed.

7

## DISCUSSION

In its sole issue, USAA argues that the supreme court's decision in *Fleming Foods of Texas, Inc. v. Rylander* compels us to use only the narrow, "plain meaning" principle of statutory construction. *See* 6 S.W.3d 278, 284-85 (Tex. 1999). USAA then relies on that interpretation of *Fleming Foods* to argue that the plain meaning of the phrase "no other tax" in former articles 4.10 and 4.11 compels us to conclude that the legislature exempted USAA from paying sales and use taxes. We disagree.

This argument requires us to construe sections of the tax code regarding the sales and use taxes and their exemptions and sections of the insurance code concerning gross receipts taxes, occupation taxes, and exemptions. *See* Tex. Tax Code Ann. §§ 151.051, .301-.354 (West 2002); Former Tex. Ins. Code art. 4.10, §§ 1, 14; art. 4.11, §§ 1, 9. Statutory construction is a matter of law, which we review *de novo*. *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex. 1989). The primary rule of statutory interpretation is to look at the intent of the legislature and construe the statute so as to give effect to that intent. *Fleming Foods*, 6 S.W.3d at 284; *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex. 1994); *Sharp v. Clearview Cable TV, Inc.*, 960 S.W.2d 424, 426 (Tex. App.—Austin 1998, pet. denied). Disputed provisions are to be considered in context, not in isolation. *Texas Workers' Comp. Comm'n v. Continental Cas. Co.*, 83 S.W.3d 901, 905 (Tex. App.—Austin 2002, no pet.); *see also Fitzgerald v. Advanced Spine Fixation Sys.*, 996 S.W.2d 864, 866 (Tex. 1999). Texas courts are to consider, among other factors, the language of the statute, legislative history, the nature and object to be obtained, and the consequences that would follow

8

from alternative constructions, even when a statute is not ambiguous on its face. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001); *Union Bankers Ins. Co.*, 889 S.W.2d at 280.

Tax exemptions are to be strictly, though reasonably, construed against the taxpayer. *North Alamo Water Supply Corp. v. Willacy Co. Appraisal Dist.*, 804 S.W.2d 894, 899 (Tex. 1991); *Clearview Cable TV, Inc.*, 960 S.W.2d at 426; *Sharp v. Tyler Pipe Indus., Inc.*, 919 S.W.2d 157, 161 (Tex. App.—Austin 1996, writ denied). When considering the scope of a tax exemption, we consider the types of taxation that could have been contemplated by the legislature when it granted the exemption. *See, e.g.*, *Millers' Mut. Fire Ins. Co. v. City of Austin*, 210 S.W. 825, 827 (Tex. Civ. App.—San Antonio 1919, no writ). Tax exemptions are subject to such strict construction because "they are the antithesis of equality and uniformity and because they place a greater burden on other taxpaying businesses and individuals." *Bullock v. National Bancshares Corp.*, 584 S.W.2d 268, 271-72 (Tex. 1979).

In contrast, the essence of USAA's argument is that *Fleming Foods* has narrowed our rules of statutory construction to one element—a consideration of "plain words" as they appear on the page, without reference to the context or purpose of the statute, and without a comparison of older versions of statutes with the newer versions.[5] *See* 6 S.W.3d at 284, 285-86. A close reading

---

[5] We discern USAA's argument from several sections of its brief when viewed as a whole. First, USAA relies on *Fleming Foods* to argue that the words "no other tax" mean "no other tax" under the plain meaning rule. *See Fleming Foods of Tex., Inc. v. Rylander*, 6. S.W.3d 278, 284 (Tex. 1999). Thus, USAA believes that its payment of gross receipts taxes exempted it from paying all other taxes imposed by the legislature, except those taxes specifically listed in former articles 4.10 and 4.11. In support of this view, USAA argues that the words "no other tax" are specific and unambiguous and should therefore not be construed by a court to mean something other than the meaning of the plain words unless there is a typographical error or the application of those words would produce an absurd result. *See id.* In addition, USAA argues that the historical background

of the supreme court's opinion in *Fleming Foods* does not support this rigid approach. The supreme

court in that case considered a particular problem of statutory interpretation that arises when the

Texas Legislative Council writes statutes as part of the legislatively mandated codification program.

*Id*. Although the Legislative Council is directed not to alter the sense, meaning, or effect of a statute,

on some occasions the statutory language differs between the original and codified versions in ways

that do, in fact, substantively alter the statute. *Id*. In that context, the supreme court considered a

very narrow question: "[w]hat effect should be given to clear, unambiguous statutes that were

drafted by the Legislative Council as part of the codification process *but that depart from prior

law*?" *Id*. (emphasis added). The court reasoned that, when the language of a newly codified version

of a statute changes prior law, the enactment of the codified version repeals the prior law. *Id*. at 284.

As a result, the supreme court decided that courts should construe such statutes from their "plain

words" unless it is obvious that the change itself was the result of a typographical error or that the

application of the literal words would produce an absurd result. *Id*.

The holding of *Fleming Foods*, then, is a narrow one. It mandates a particular method

of statutory construction for recently codified statutes—when the language of a codified version

clearly changes the meaning of a statute from that of its former version, courts may not ignore those

---

of this statute is irrelevant and that there is no need to compare older versions of the statute with newer versions. *See id*. at 285, 286. USAA believes that the intent of the legislature can only be gleaned from the words of the statute as they appear on the page. It cautions that the gross receipts tax "is a particularly onerous burden" and that it is "entirely rational" that the legislature intended to exempt insurance companies from all other taxes it might impose. Finally, USAA argues that the legislature, in recognizing that "insurance companies pay millions of dollars in taxes[,] . . . balanced that tax burden with a tax exemption that covered all other taxes." However, in making this claim, USAA refuses to consider what could have been contemplated by the legislature when it created the tax exemption and urges us to limit our consideration of the issue to its narrow view.

10

changes by relying on the Legislative Council's general mandate not to alter the meaning of statutes. *Id*. at 285. "When there is no room to interpret or construe the current law as embodying the old," courts are to consider the prior law repealed and apply the traditional rules to the "plain words" of the codified statute. *Id*. at 286. Conversely, when the current law reflects no substantial change from the language of the prior law, and therefore can be interpreted or construed as embodying the prior law, the *Fleming Foods* directives have no application.[6] *Id*.; *Johnson*, 774 S.W.2d at 655; *Texas Dep't of Transp. v. City of Floresville Elec. Power & Light Sys.*, 53 S.W.3d 447, 454 (Tex. App.—San Antonio 2001, no pet.).

We have already noted that the language imposing gross receipts taxes and providing for an exemption from "other taxes" did not change through the codification process. *Compare* Act approved May 16, 1907, ch. 18, § 8, *and* Act of Oct. 31, 1936, ch. 495, art. 4, § 5, *with* Act of May 29, 1981, ch. 389, § 36, art. 4.10, *and* Act of June 17, 1993, ch. 685, § 3.11; *compare also* Act of

---

[6] USAA also argues that we cannot consider the legislative history or the circumstances under which these statutes were originally enacted. Because the code construction act prescribed such consideration when construing statutes enacted by the sixtieth or a subsequent legislature, and former articles 4.10 and 4.11 were originally passed before the sixtieth legislature, USAA believes that we are prohibited from considering any factors other than the words of the statutes as they appear on the page. *See* Tex. Gov't Code Ann. § 311.023 (West 1998). We note, however, that Texas courts developed a body of common law for construing statutes long before the legislature enacted the code construction act and often considered issues such as those objected to by USAA. *See, e.g.*, *Kansas City Life Ins. Co. v. Love*, 109 S.W. 863, 864 (Tex. 1908) (considering the "intent and meaning" of the original version of former article 4.10 and the context of the insurance industry at the time the statute was enacted to determine that out-of-state insurance companies were subject to the gross receipts tax); *Texas Co. v. Stephens*, 103 S.W. 481, 486 (Tex. 1907) (considering the context of a taxed industry when defining the meaning of the word "dealer" differently than the plain-meaning, dictionary definition available in 1907); *Millers' Mut.*, 210 S.W. at 826-27 (reviewing the legislative history of a tax exemption and placing that exemption in the context of the creation of a system of occupation taxes). Thus, USAA's argument is without merit.

11

May 20, 1971, ch. 406, § 1, *with* Act of May 29, 1981, ch. 389, § 36, art. 4.11.  Thus, the language of former articles 4.10 and 4.11 can be construed as embodying that of the pre-codified versions. As a result, *Fleming Foods* has no application here.

We now turn to the statutes themselves.  The sales tax is a tax of general applicability, imposed on the sale of each taxable item in this state.  *See id*. § 151.051(a) (West 2002).  The use tax also applies in a general way to tax the storage, use, or other consumption of taxable items purchased from a retailer.  *Id*. § 151.101(a) (West 2002).  Within the tax code, the legislature created certain explicit exemptions from sales and use taxes for some kinds of transactions, for governmental entities, Indian tribes, religious, educational, and public service organizations, and for transactions involving particular items such as newspapers, magazines, airplanes, and timber, among others.  *See generally id*. §§ 151.301-.355 (West 2002).  Outside of the tax code, the legislature has made specific provisions exempting certain entities from the sales tax.  *See, e.g.*, Tex. Water Code Ann. § 15.954(f) (West Supp. 2003) (exempting nonprofit water supply or sewer service corporations "from payment of any sales tax"); Tex. Transp. Code Ann. § 452.108(e) (West Supp. 2003) (exempting regional transportation authorities from "all sales, use, and motor vehicle taxes imposed by this state"); Tex. Rev. Civ. Stat. Ann. art. 5190.6, § 4D(l) (West Supp. 2003) (stating that sales and use taxes created in the tax code do "not apply to tangible personal property purchased by a person for use in a spaceport").  Significantly, when the legislature means to exempt a transaction or an entity from the sales or use taxes, it indicates its intent by direct reference to those taxation provisions.  *See* Tex. Water Code Ann. § 15.954(f); Tex. Transp. Code Ann. § 452.108(e); Tex. Rev. Civ. Stat. Ann. art. 5190.6, § 4D(l).

12

In contrast, in former articles 4.10 and 4.11 the legislature imposed taxes that were narrow in scope. *See* Former Tex. Ins. Code art. 4.10, § 1; art. 4.11, § 1.[7] They described a system of taxation on insurance companies meant to function as an occupation tax and calculated on the gross receipts of those businesses. *See* Former Tex. Ins. Code art. 4.10, §§ 1, 14; art. 4.11, §§ 1, 9; *see also* Act approved May 16, 1907, ch. 18, § 8; *State v. National Lloyds*, 368 S.W.2d 765, 766 (Tex. 1963). In doing so, the legislature exempted the affected insurance companies from all taxes and license fees then "collectable" [sic] in 1907 and directed that no occupation or other taxes be levied on them. Act approved May 16, 1907, ch. 18, § 8. Former articles 4.10 and 4.11 both contain language that further clarifies the narrow focus of this taxation scheme by defining the gross receipts taxes as a replacement for other occupational taxes. *See* Former Tex. Ins. Code art. 4.10, § 14; art. 4.11, § 9; *see also Millers' Mut.*, 210 S.W. at 827.[8] Thus, the statutes themselves make clear that the "gross premiums tax like the franchise tax is a charge which corporations subject thereto must pay for the privilege of engaging in business in Texas." *National Lloyds*, 368 S.W.2d at 766.

---

[7] Because the history of former articles 4.10 and 4.11 shows that the legislature created former article 4.11 out of earlier versions of former article 4.10, and because neither party urges us to treat the language in former article 4.11 any differently from that in former article 4.10, we consider the purpose and intent of the gross receipts taxes and the exemptions provided for in these articles to be identical.

[8] The court in *Millers' Mutual* considered "no other tax" language found in a statute providing for a gross receipts tax on mutual insurance companies. 210 S.W. at 826-27. Although it indicated that the Texas Constitution at that time prohibited an exemption from property taxes, the court did not hold that the "no other tax" language violated the constitution. *Id.* Rather, the court considered the context within which the legislature created the tax exemption and determined that the tax exemption language did not reach to property taxes because the "taxation of property was not in the contemplation of the legislature when the exemption from further taxation was granted." *Id.* The constitutional issue was one part of the context the court analyzed.

13

Because the scope of the gross receipts taxes is narrow, the exemptions created in tandem with them must be read in the same narrow context. *See Millers' Mut.*, 210 S.W. at 827. The actual language of the exemption sections supports this approach. *See* Former Tex. Ins. Code art. 4.10, § 14; art. 4.11, § 9. In each, the exemption language establishes that the gross receipts tax was intended to substitute for occupational and other kinds of business taxes rather than an addition to those taxes. *Id*. art. 4.10, § 14; art. 4.11, § 9. For example, former article 4.10 states specifically in the context of the exemption from the "occupational tax" that "no other tax shall be levied or collected." *Id*. art. 4.10, § 14. Likewise, former article 4.11 refers first to the gross receipts taxes, creates an exemption from "all taxes and license fees," and then makes some exceptions that would allow some limited types of business taxes to the affected insurance companies. *Id*. art. 4.11, § 9.

Each exemption section also includes mandates that the statutes do not prohibit the levy and collection of taxes on the real and personal property of insurance companies. *See id*. art. 4.10, § 14; art. 4.11, § 9. These mandates, like the exemptions themselves, are embedded in the creation of a specialized occupational tax system for insurance companies. *Id*. arts. 4.10, 4.11. Thus, we must consider the context in which these mandates arose in order to perceive their meaning. The first version of the mandates appeared in the original version of article 4.10. *See* Act approved May 16, 1907, ch. 18, § 8. At that time, only a few types of taxes existed in Texas: (1) the taxation of property; (2) occupation, license, and franchise taxes; (3) a poll tax; and (4) an inheritance tax. *See* Miller, *supra*, at 264-321. When the legislature indicated that the tax exemption was not to impact the ability of the state or any political subdivision of the state to collect property taxes, the other kind of tax to which insurance companies might be subject at the time, it acted to establish the parameters

14

of the exemptions—that the gross receipts tax replace other occupation or franchise taxes but not all categories of taxes.

Thus, when we consider the language of the statutes in their historical context, the nature and object of the tax exemptions in former articles 4.10 and 4.11 become clear. Former articles 4.10 and 4.11 state that the legislature—in 1907 and in the ensuing years—intended to subject insurance companies to these specific gross receipts taxes in lieu of any general occupation and franchise taxes. Sales and use taxes were "not in the contemplation of the legislature when the exemption from further taxation was granted" because they did not exist at that time. *See Millers' Mut.*, 210 S.W. at 827. Certainly, provisions constructed to exempt insurance companies from occupation and franchise taxes can have no effect on the responsibility of those insurance companies to pay later-enacted taxes of general applicability. We overrule USAA's issue on appeal.[9]

## CONCLUSION

We are persuaded that former articles 4.10 and 4.11 created a system of occupation taxes specific to the insurance industry. As a result, we find that the exemptions found in those articles acted only to exempt the insurance industry from general occupation and franchise taxes. Those exemptions did not act to exempt the insurance industry from the full range of non-occupation

---

[9] The Comptroller offers additional arguments in the event we were to find that the tax exemption language applied to sales and use taxes. Because we find that the exemption language did not apply to sales and use taxes, we will not reach the merits of those arguments. In addition, USAA directs our attention to caselaw from several other jurisdictions to support their position. Because we hold that Texas law is dispositive, we need not address those cases.

and non-franchise taxes the State subsequently imposed, including sales and use taxes.  We affirm the judgment of the district court.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Justice Patterson concurs in the judgment only.

Affirmed

Filed:   November 6, 2003